## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| TED KAMEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 6:18-cv-00422-JDK-KNM |
| | § | |
| AVENU INSIGHTS & ANALYTICS, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT & BRIEF IN SUPPORT

Joseph Pevsner
State Bar No. 15874500
Joseph.Pevsner@tklaw.com

Austin Smith
State Bar No. 24102506
Austin.Smith@tklaw.com

THOMPSON & KNIGHT, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel. (214) 969-1700
Fax (214) 969-1751

**ATTORNEYS FOR PLAINTIFF TED KAMEL**

TABLE OF CONTENTS

I.    STATEMENT OF UNDISPUTED MATERIAL FACTS  .................................................1

II.   STATEMENT OF ISSUES  .........................................................................................4

III.  LEGAL STANDARD.................................................................................................4

IV.   ARGUMENTS AND AUTHORITIES.............................................................................6

    A.    Kamel is Entitled to Summary Judgment on His Declaratory Judgment
        Claim Because the Alleged Agreement is Unenforceable ..................................... 6

        1.    The 2017 Agreement is Unenforceable Because Kamel Never
            Signed It ..................................................................................................... 6

        2.    The 2017 Agreement is Unenforceable Because it is Not Supported
            by Valid Consideration ............................................................................... 9

        3.    The 2017 Agreement is Unenforceable Because it is Overbroad,
            Unreasonable, and Contrary to Public Policy........................................... 13

    B.    Kamel is Entitled to Summary Judgment on Liability for His Tortious
        Interference Claim ............................................................................................ 15

    C.    Avenu Cannot Prevail On Its Breach of Contract Claims .................................... 17

        1.    Avenu's Claim for Breach of the 2017 Agreement Fails as a Matter
            of Law ....................................................................................................... 17

            a.    The 2017 Agreement is Unenforceable .........................................17

            b.    It is Undisputed that Kamel's Alleged Breach of the Non-Compete
                Provision Did Not Cause Any Damages to Avenu.......................18

        2.    Avenu's Claim for Breach of the Non-Disclosure Provision Fails
            as a Matter of Law .................................................................................... 19

            a.    Kamel Did Not Disclose Any Proprietary or Confidential
                Information .....................................................................................19

            b.    It is Undisputed that Kamel's Alleged Breach of the Nondisclosure
                Provision Did Not Cause Any Damages to Avenu.......................23

        3.    Kamel Did Not Solicit Avenu's Current or Prospective Clients
            During the Duration of the Non-Solicitation Provision............................ 26

    D.    Summary Judgement is Proper on Avenu's Claim that Kamel Breached
        His Fiduciary Duty............................................................................................ 27

   E. Avenu is Not Entitled to An Award of Attorney's Fees or Costs.......................... 28

V. CONCLUSION....................................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,*
    209 S.W.3d 644 (Tex. 2006) ....................................................... 9

*Anderson v. Liberty Lobby Inc.,*
    477 U.S. 242 (1986) ................................................................... 5

*Angelou v. African Overseas Union,*
    33 S.W.3d 269 (Tex. App.—Houston [14th Dist.] 2000, no pet. ............................................. 6

*Beck v. Law Offices of Edwin J. Terry, Jr.,*
    284 S.W.3d 416 (Tex. App.—Austin 2009, no pet.) ............................................. 27

*Bray v. Squires,*
    702 S.W.2d 266 (Tex. App.—Houston [1st Dist.] 1985, no writ) ...................................... 27, 28

*Butler v. Arrow Mirror & Glass, Inc.,*
    51 S.W.3d 787 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ............................................. 14

*Butnaru v. Ford Motor Co.,*
    84 S.W.3d 198 (Tex. 2002) ...................................................... 15

*Byers v. Dall. Morning News, Inc.,*
    209 F.3d 419 (5th Cir. 2000) .................................................... 5

*Calce v. Dorado Exploration, Inc.,*
    309 S.W.3d 719 (Tex. App.—Dallas 2010, no pet.) ................................................. 6

*Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.,*
    655 F.2d 598 (5th Cir. 1981) .................................................... 5

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................. 4, 5

*CRC–Evans Pipeline Intern., Inc. v. Myers,*
    927 S.W.2d 259 (Tex. App.—Houston [1st Dist.] 1996, no writ ........................................... 19

*Curtis v. Ziff Energy Group, Ltd.,*
    12 S.W.3d 114 (Tex. App.—Houston [14th Dist.] 1999, no pet. ........................................... 14

*DeSantis v. Wackenhut Corp.,*
    793 S.W.2d 670 (Tex. 1990) ..................................................... 9, 15

*Eurecat US, Inc. v. Marklund*,
   527 S.W.3d 367 (Tex. App.—Houston [14th Dist.] 2017)............................................. 9, 10, 13

*Evan's World Travel, Inc. v. Adams*,
   978 S.W.2d 225 (Tex. App.—Texarkana 1998, no pet.)........................................................ 14

*Ferguson v. Nat'l Broad. Co.*,
   584 F.2d 111 (5th Cir. 1978) ............................................................................................... 6

*Fontenot v. Upjohn Co.*,
   780 F.2d 1190 (5th Cir. 1986) ............................................................................................. 5

*Guy Carpenter & Co. v. Provenzale*,
   334 F.3d 459 (5th Cir. 2003) ............................................................................................. 19

*Huckaba v. Ref-Chem, L.P.*,
   892 F.3d 686 (5th Cir. 2018) ............................................................................................... 6

*In re Bunzl USA, Inc.*,
   155 S.W.3d 202 (Tex. App.—El Paso 2004, no pet.)......................................................... 6, 7

*In re Mun. Bond Reporting Antitrust Litig.*,
   672 F.2d 436 (5th Cir. 1982) ............................................................................................... 6

*In re Staley*,
   320 S.W.3d 490 (Tex. App.—Dallas 2010, no pet.)............................................................. 6

*Light v. Centel Cellular Co.*,
   883 S.W.2d 642 (Tex. 1994)................................................................................................. 9

*New York Party Shuttle, LLC v. Bilello*,
   414 S.W.3d 206 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ......................................... 6

*Oxford Glob. Res., Inc. v. Weekley-Cessnun*,
   No. CIV.A. 3:04-CV-0330, 2005 WL 350580 (N.D. Tex. Feb. 8, 2005)......................... 19, 20

*Powerhouse Prods., Inc. v. Scott*,
   260 S.W.3d 693 (Tex. App.—Dallas 2008, no pet.)........................................................... 10

*Rimkus Consulting Group, Inc. v. Cammarata*,
   255 F.R.D. 417 (S.D. Tex. 2008)........................................................................................ 14

*Scaife v. Associated Air Ctr., Inc.*,
   100 F.3d 406 (5th Cir. 1996) ............................................................................................... 7

*Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*,
   843 S.W.2d 470 (Tex. 1992)............................................................................................... 15

*Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*,
  718 F.3d 448 (5th Cir. 2013) .................................................................. 7

*Turner v. Baylor Richardson Med. Ctr.*,
  476 F.3d 337 (5th Cir. 2007) .................................................................. 6

*Wright v. Sport Supply Group, Inc.*,
  137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.) ......................... 14

*Zep Mfg. Co. v. Harthcock,*
  824 S.W.2d 654 (Tex. App.—Dallas 1992, no writ) .............................. 19

## Statutes

TEX. CIV. PRAC. & REM. CODE § 38.001 .................................................... 28

TEX. BUS. & COM. CODE § 15.50 ........................................................... 14, 19

TEX. BUS. & COM. CODE § 15.51(c) ................................................... 15, 17, 29

TEX. CIV. PRAC. & REM. CODE § 37.009 .................................................... 29

## Rules

FED. R. CIV. P. 56 ................................................................................. 4, 5

Plaintiff Ted Kamel ("Kamel") files this Motion for Partial Summary Judgment against Defendant Avenu Insights & Analytics, LLC ("Defendant" or "Avenu") as follows:

## I.      STATEMENT OF UNDISPUTED MATERIAL FACTS

In 2006, Kamel began working at Avenu (formally known as Government Revenue Solutions, LLC ("GRS")) as an Executive Client Services Manager in Texas.[1][2] Ex. A, ¶ 3. Avenu provides sales tax revenue recovery and reporting services to municipalities in Texas. Kamel was an at-will employee and he worked exclusively in Texas. Ex. A, ¶ 3.

During a phone call on March 29, 2018, April Bullion, Avenu's Vice President of Human Resources, Kamel resigned from Avenu. Ex. A, ¶ 4.

In April 2018, Kamel attended a Government Finance Officers Association of Texas ("GFOAT") conference in Austin, Texas, where he spoke with Richard Fletcher, the Vice President of Sales at Sales Tax Assurance, an HdL Company ("STA"). Ex. A, ¶ 5. On May 13, 2018, Kamel received an employment offer from STA. Kamel accepted this offer on May 15, 2018, and began working on June 4, 2018. Ex. A, ¶ 6. Kamel's employment agreement with STA included a starting salary of $100,000, plus commissions and bonuses, full medical benefits, and stock in the employee-owned company.[3] Ex. A, ¶ 6. Under the employment agreement with STA, STA prohibits Kamel from using any information Kamel obtained from his prior employment. Ex. A, ¶ 6. As a condition to accepting the offer, Kamel had to confirm that he would not use any of Avenu's proprietary confidential information in his employment with STA. Ex. A-1 at 2. STA also did not want Kamel visiting cities and finance directors in Texas during his first year of employment. Ex. A, ¶ 6.

---

[1] Avenu is also referred to as MuniServices.

[2] Attached as Exhibit A is the sworn affidavit of Ted Kamel.

[3] Attached as Exhibit A-1 is a true and correct copy of Kamel's Offer of Employment from STA.

On June 20, 2018, Avenu sent a "Notice of Breach" letter to Kamel, alleging that Kamel is bound by Avenu's "Nondisclosure, Noncompete and Non-solicitation Agreement" (the "2017 Agreement") and that Kamel's acceptance of employment with STA was in direct violation of the 2017 Agreement.[4] *See also* Ex. A, ¶ 6. Avenu also sent a letter to STA: (i) claiming that Kamel is bound by the 2017 Agreement; (ii) threatening legal action against STA if STA continued to employ Kamel; and (iii) demanding that STA terminate Kamel's employment.[5] Attached to this letter, Avenu included a blank copy of an unsigned, 2017 Agreement that contained neither Kamel's name nor signature — although the 2017 Agreement, by its terms, requires both to be valid.[6] *See also* Ex. A, ¶ 9.

Avenu has never produced a signed version of the 2017 Agreement. Ex. A, ¶ 8. Instead, Avenue claims that on August 29, 2017, Kamel "electronically acknowledged, executed and agreed" to the 2017 Agreement. (Dkt. #43, ¶ 23). Kamel denies electronically signing the 2017 Agreement. The Agreement contains the following non-competition provision:

> 2.1. During Employee's employment with GRS and for a period of twelve (12) months following the termination of Employee's employment with GRS whether for cause or voluntarily, Employee agrees to refrain from owning or controlling any interest in, or working (defined as performing duties and having responsibilities that are the same or similar in nature to those that Employee performed while employed by GRS), directly or indirectly, for, any person, firm, partnership, corporation, or other entity that is: (i) in competition with GRS (a "GRS Competitor"). A GRS Competitor means a person or entity engaged in business as a provider of revenue enhancement, analytics, technology and consulting services to government agencies, within the Central Region to include; Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, and Louisiana.

---

[4] Attached as Exhibit B is a true and correct copy of the "Notice of Breach" letter from Avenu.

[5] Attached as Exhibit C is a true and correct copy of the letter from Avenu to STA threating legal action.

[6] Attached as Exhibit D is a true and correct copy of the 2017 Agreement.

Ex. D, ¶ 2.1. The 2017 Agreement also contains "Non-disclosure" and "Non-solicitation" provisions. Ex. D, ¶¶ 1, 3.[7]

In response to Avenu's letter, STA attempted to reach a compromise with Avenu, including limiting Kamel's geographic territory to the State of Washington. Ex. C. Avenu, however, continued to demand that STA fire Kamel. *Id*. In response to Avenu's threats, STA fired Kamel on July 9, 2018. *See Id*.

On July 11, 2018, Kamel filed suit against Avenu asserting claims for tortious interference with a contract, tortious interference with prospective relations, and declaratory judgment seeking to declare the 2017 Agreement unenforceable. (*See* Dkt. #1) On August 16, 2018, Avenu removed the case to the United States District Court for the Eastern District of Texas, Tyler Division (Dkt. #1). On August 23, 2018, Avenu filed its Original Answer and Counterclaim asserting claims for breach of contract and breach of fiduciary duty (Dkt. #4). On November 11, 2019, Avenu filed an Amended Answer and Counterclaim (Dkt. #47).

Since his termination from STA, Kamel has been unable to secure similar employment for an entire year due to Avenu's continued threats. Ex. A, ¶ 11. The 2017 Agreement's non-competition provision's 12-month time restriction expired on March 29, 2019. Ex. D. In April 2019, Kamel attended another GFOAT conference in Austin, Texas, where he spoke with Jason Perry, the President of Azavar Audit Solutions, Inc. ("Azavar"). Ex. A, ¶ 13. On May 15, 2019, Azavar offered to hire Kamel for the position of Senior Vice President with Azavar. Kamel's employment with Azavar began on June 10, 2019. Ex. A, ¶ 13.

---

[7] In Avenu's recent Amended Counterclaim, it now asserts that Kamel breached an alleged Non-Solicitation Agreement.

## II.      STATEMENT OF ISSUES

1.      Whether Avenu's "Nondisclosure, Noncompete and Non-solicitation Agreement" (the "2017 Agreement") is enforceable despite the fact Kamel did not sign the Agreement.

2.      Whether the 2017 Agreement is unenforceable because it is not supported by valid consideration.

3.      Whether the 2017 Agreement is unenforceable under the Texas Covenants Not to Compete Act because it is overbroad, unreasonable, and contrary to public policy.

4.      Whether Avenu knew at the execution of the 2017 Agreement that the restrictive covenants did not contain geographical limitations that were reasonable and the limitations imposed a greater restraint than necessary to protect it goodwill or other business interests.

5.      Whether Kamel provided STA with any proprietary and confidential information belonging to Avenu.

6.      Whether Avenu's alleged proprietary and confidential information is protectable even though its available in the public domain.

7.      Whether Avenu is liable for tortiously interferening with Kamel's employment contract with Sales Tax Assurance, an HdL Company.

8.      Whether Avenu has suffered any damages as a result of Kamel's employment with STA for less than a month.

9.      Whether Avenu has suffered any damage as a result of Kamel allegedly provided STA with Avenu's alleged proprietary and confidential information.

10.      Whether Kamel solicited any current or prospective clients during the duration of the nonsoliciation provision.

11.      Whether Kamel breached any fiduciary duty owed to Avenu prior to his resignation.

12.      Whether Kamel owed any fiduciary duty to Avenu after his resignation.

13.      Whether Kamel breached any fiduciary duty owed to Avenu following to his resignation.

14.      Whether Kamel is entitled to his reasonable and necessary attorney's fees.

## III.      LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims

or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper

under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden.  Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss

a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## IV.   ARGUMENTS AND AUTHORITIES

**A.   Kamel is Entitled to Summary Judgment on His Declaratory Judgment Claim Because the Alleged Agreement is Unenforceable.**

### 1.   The 2017 Agreement is Unenforceable Because Kamel Never Signed It.

Under Texas law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley,* 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.).

Avenu cannot get past the first element—i.e., the existence of a valid contract. The party seeking to enforce the contract bears the burden of proving the existence of the contract and its terms. *Calce v. Dorado Exploration, Inc.,* 309 S.W.3d 719, 737 (Tex. App.—Dallas 2010, no pet.). Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind. *See Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Whether a written contract is signed is relevant in determining of whether the contract is binding on the parties. *New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 214 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, no pet.)). Parties may provide that the signature of each party is a prerequisite to a binding written contract. *Id.* "[W]hether a signature is required to bind the parties is a question of the parties' intent." *Huckaba v. Ref-Chem, L.P.*, 892

F.3d 686, 689 (5th Cir. 2018) (citing *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 454

(5th Cir. 2013)).

      The 2017 Agreement contains the following signature block:

EMPLOYEE

Print Name:     _____

Signature:     _____

Date:     _____

Ex. D at 3. Paragraph 7 of the 2017 Agreement also contains the following statement: "This

Agreement sets forth the entire understanding of the parties regarding the subject matter contained

herein . . . and shall not be modified except by a written document signed by all parties." Ex. D,

¶ 7. This signature block, along with the clause in the 2017 Agreement barring amendments

without a writing signed by both parties, shows that the parties' intent Kamel's signature for either

party to be bound by the 2017 Agreement. *See Scaife v. Associated Air Ctr., Inc.,* 100 F.3d 406,

410–11 (5th Cir. 1996) (affirming summary judgment where the presence of a signature block and

a signed-modification requirement clause clearly evidenced the parties' intent that the agreement

be signed before it could be enforced).

      This case is similar to *In re Bunzl USA, Inc.*, 155 S.W.3d 202 (Tex. App.—El Paso 2004,

orig. proceeding [mand. denied]). The court in *Bunzl* held that the trial court did not abuse its

discretion in denying an employer's motion to compel arbitration where the employer failed to (1)

sign the arbitration agreement and (2) show that the parties intended to be bound without the

employer's signature. 155 S.W.3d at 210–12.[8] The employer submitted an affidavit to the court

stating that the agreement was kept in the employee's file and had in fact been reviewed before

---

[8] "A summary motion to compel arbitration is essentially a motion for partial summary judgment, subject to the same evidentiary standards." *In re Bunzl*, 155 S.W.3d at 208.

the employee's termination. *See id.* at 206. The trial court's decision to deny the motion to compel arbitration was affirmed because the signature block for the employer was left blank and the agreement barred amendments without a writing signed by both parties, both of which are present here. *Id.* at 211.

Avenu cannot provide any evidence of a signed agreement between the parties, and Avenu's claim that Kamel "electronically acknowledged, executed and agreed to" the 2017 Agreement is wholly inconsistent with having this signature block, which requires a written signature. Indeed, Avenu's Corporate Representative, who assisted in drafting the Agreement, testified that the purpose of the signature line was for a wet signature.[9]

```
2        Q.   Okay.  So an electronic signature would not be
3   on the signature line?
4        A.   Correct, that it would not be on the physical
5   document, itself.
6        Q.   So the only signature on the signature line
7   would be wet?
8        A.   That's correct.
```

Bullion Dep. at 66:2-8.[10]

Furthermore, Avenu required a wet signature for other employment documents.[11] The evidence demonstrates that Kamel was required to sign the 2017 Agreement in order to be bound by it, which he did not do. Thus, the Court should find that the 2017Agreement is not binding on Kamel because he did not sign it.

---

[9] Attached as Exhibit E are excerpts from the deposition of April Bullion with exhibits, who was designated as Avenu's Corporate Representative to testify as to matters listed on Plaintiff's deposition notice attached as Exhibit F.

[10] The deposition of Daryl Savage, Avenu's General Counsel, was conducted on November 19, 2019. Mr. Savage testified that he drafted the 2017 Agreement and that the purpose of the signature block was for a wet signature. Kamel will provide the Court with his deposition excerpts upon receipt of the transcript.

[11] Attached as Exhibit G is a true and correct copy of the Avenu Non-tobacco Discount Affidavit hand signed by Kamel on February 12, 2018.

2.      **The 2017 Agreement is Unenforceable Because it is Not Supported by Valid Consideration.**

"[T]he Legislature and the courts [do] not allow an employer to spring a non-compete covenant on an existing employee and enforce such a covenant absent new consideration from the employer." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). "[A]n agreement not to compete, like any other contract, must be supported by consideration." *Id.* (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 n.6 (Tex. 1990)). "[A] covenant not to compete could be signed after the employment relationship began so long as the covenant is supported by new consideration in an enforceable contract." *Alex Sheshunoff Mgmt. Servs.,* 209 S.W.3d at 654. The consideration from the employer "must give rise to the employer's interest in restraining the employee from competing." *Id.* at 648–49.

The 2017 Agreement states that, "in order to protect GRS's Confidential Information and business interests, Employee acknowledges that his/her employment by GRS and the payment of compensation now and in the future to Employee by GRS is conditioned upon Employee's execution of this Agreement[.]" Ex. C at 1.[12] The only consideration stated in the 2017 Agreement is continued employment, which by itself is insufficient.[13] *See Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 389 (Tex. App.—Houston [14th Dist.] 2017).  Because Kamel was an at-will employee, a promise of continued employment is illusory and does not constitute consideration. *See Light v. Centel Cellular Co.*, 883 S.W.2d 642, 644–45 (Tex. 1994), *abrogated on other grounds by Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 779 (Tex. 2011) ("Consideration

---

[12] Agreement also states that "Nothing contained herein shall create in favor of Employee any guarantee of continued employment with GRS." Ex. D at ¶ 7.

[13] Bullion Dep. at 70:11-13 (Q. Now, in order to continue working for GRS, all the employees had to sign this agreement? A. That's correct.)

for a promise, by either the employee or the employer in an at-will employment, cannot be dependent on a period of continued employment.").

Furthermore, Avenu may argue that the consideration for the 2017 was an implied promise to provide Kamel with confidential information. But Avenu cannot point to any evidence that it provided Kamel with any new confidential or proprietary information after August 29, 2017. Avenu also cannot point to any evidence that its claims for breach of the 2017 Agreement *are based* on the disclosure of confidential information it provided to Kamel after August 29, 2017, that differed from information he previously possessed. *Eurecat*, 527 S.W.3d at 390 ("Eurecat does not point to any evidence that its claims for breach of the 2011 agreements were based on disclosure of confidential information it provided to Marklund and Wene after January 31, 2011 that differed from information they previously possessed."); *see Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 697–98 (Tex. App.—Dallas 2008, no pet.) (holding confidential information employer provided ongoing employee prior to agreement could not supply consideration for agreement). Nor can Avenu point to evidence that it provided any such different information *because* Kamel allegedly signed the 2017 Agreements. *See Powerhouse Prods.*, 260 S.W.3d at 698-99 (concluding any post-agreement provision of confidential information to employee could not supply consideration, as evidence did not show employer had provided additional information "because [employee] signed the agreement").

To the contrary, the evidence shows that Avenu maintains current and prospective customer lists on a database called SalesForce, where information is uploaded manually by a salesperson, like Kamel.[14] Kamel was given "limited access" information on SalesForce, specific

---

[14] Bullion Dep. at 29:20-21, 30:4-6.

to his own clients.[15] Kamel started working for Avenu (or its predecessor) in 2006 and had access to SalesForce prior to allegedly signing the 2017 Agreement.[16] Avenu's Corporate Representative testified that Kamel received confidential information before he allegedly signed the Agreement and that she was unaware of any additional confidential or proprietary information he received after he allegedly signed the Agreement:

```
 5       Q.   So just to -- to reiterate, Ted received
 6   confidential information before he signed the agreement?
 7       A.   I can't confirm specifically, but yes.
 8       Q.   And you cannot identify any additional
 9   confidential information he received after he signed the
10   noncompete agreement?
11       A.   I'm not saying that there wasn't any.  I'm
12   saying I cannot confirm today.
13       Q.   You can't identify it?
14       A.   Correct.
```

Bullion Dep. at 83:5-14.[17]

---

[15] Bullion Dep. at 30:7-14, 32:10-12.

[16] *See* Bullion Dep. at 75:15-22.

[17] *See also* Bullion Dep. at 77:6-12. It is worth noting to Ms. Bullion uncertain or unaware of the majority of the matters listed on Plaintiff's deposition notice. *See* Ex. F. The words "uncertain," "unaware," and "unsure" became a common theme throughout the deposition. "Uncertain" was stated fifty-one (51) times. "Unsure" was stated twenty-two (22) times. "Unsure" was stated thirty-five (35) times.

```
 5      Q.   (BY MR. SMITH)  Can you point to any additional
 6  confidential information right now?
 7      A.   I pointed to potential examples.  I do not have
 8  any specifics in front of me that I could provide.
 9      Q.   Do you know of any specifics?
10      A.   Specific examples, no.
11      Q.   Not examples.  Actual confidential information.
12      A.   Oh, gotcha.  Hold on.  Let me think about that
13  just to be certain I answer -- I cannot point to a
14  specific document.
15      Q.   Any information, specific information, a name?
16      A.   I cannot.
```

Bullion Dep. at 84:5-16.

```
11      Q.   Ultimately you can't point to any information,
12  documents that Ted received for signing his noncompete
13  agreement -- nonsolicit --
14      A.   I specifically cannot point to one today,
15  correct.
```

Bullion Dep. at 86:11-15.[18] Topic V identified in Plaintiff's Deposition Notice of Avenu's Corporate Representative requested Avenu to designate the persons most knowledgeable regarding "Any and all bases for Avenu's contention that "Confidential Information" (as that term is used in Defendant's Counterclaim) was possessed by Avenu or was given by Avenu to Plaintiff." Ex. F at 5. Avenu is bound by its inability to identify any such information at the deposition.

Moreover, even if Avenu could show that it provided confidential information to Kamel after the date it claims he electronically signed the 2017 Agreement, there still would be no valid consideration. That is because Kamel signed a Confidentiality Agreement on March 20, 2006, in

---

[18] *See also* Bullion Dep. at 88:18-21.

which GRS promised it would provide Kamel access to confidential information, including client lists.[19] Accordingly, Avenu was <u>already obligated</u> to provide Kamel with confidential information, including client lists. *See* Ex. H; *see also Eurecat*, 527 S.W.3d at 390 ("[Employees] already were required to maintain the confidentiality of [Employer's] trade secrets and confidential information under [previous] agreements"). Because consideration must consist of something that the providing party is not already obligated to provide, any provision of confidential information after Kamel allegedly electronically signed the 2017 Agreement does not constitute valid consideration.

In short, it is undisputed that Kamel learned everything he knew about Avenu's customers prior to him allegedly signing the 2017 Agreement. Avenu cannot point to a single piece of evidence indicating that Kamel received additional confidential or proprietary information after he allegedly signed the Agreement. And Avenu was already under an obligation to provide Kamel with such information. *See* Ex. H. Avenu's position that it provided Kamel access to information, and then made him sign a contract that converted that prior information into "confidential information" is legally untenable. The only possible consideration remaining is continued employment—which is not valid consideration, particularly for an alleged employment agreement that seeks to impose confidentiality or other restrictive covenants on an at-will employee, as all parties agree Kamel was.

### 3.     The 2017 Agreement is Unenforceable Because it is Overbroad, Unreasonable, and Contrary to Public Policy.[20]

Under the Texas Covenants Not to Compete Act, a noncompete agreement is enforceable only if, among other things, "contains reasonable limitations on time, geographical area, and scope of activity that do not impose a greater restraint than necessary to protect the goodwill or other

---

[19] Attached as Exhibit H is a true and correct copy of the **signed** March 20, 2006 Confidentiality Agreement.

[20] Although the time-period restraint of the alleged Non-Compete provision has expired, this issue is not moot and still justiciable because it directly impacts Kamel's tortious interference claim.

business interest of the promisee." TEX. BUS. & COM. CODE § 15.50. The non-competition provision of the 2017 Agreement does not satisfy this requirement.

"Texas courts have found that noncompetition covenants that cover areas where the employee did not actually work or clients whom the employee did not actually serve during his employment are overbroad and unenforceable." *Rimkus Consulting Group, Inc. v. Cammarata*, 255 F.R.D. 417, 435 (S.D. Tex. 2008); *see, e.g., Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) ("[A] covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable.").[21]

The restrictive covenants at issue here purport to preclude Kamel from "owning or controlling any interest in, or working" either "directly or indirectly, for, any person, firm, partnership, corporation, or other entity" that is in competition with Avenu. This is defined as a "person or entity engaged in business as a provider of revenue enhancement, analytics, technology and consulting services to government agencies, within the Central Region to include; Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, and Louisiana." The restriction in this case is unreasonably overbroad on its face because it covers areas where Kamel did not actually work. It is undisputed that Kamel only worked within the State of Texas.[22]

Indeed, the restriction is even broader than it first appears, because it purports to prevent Kamel from working for any company anywhere in the world if that company also happens to

---

[21]*Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793-94 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant."); *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 232-33 (Tex. App.—Texarkana 1998, no pet.) ("Adams worked in Harrison County, Texas. The restraint on Adams from doing business anywhere in the United States or the state of Texas is clearly an unreasonable restriction."); *accord Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer.").

[22] Bullion Dep. at 31:9-15.

engage in revenue enhancement, analytics, technology, or consulting services for government agencies within any of the thirteen states listed. For example, even if Kamel were to move to California, work for a company based in California, work solely within in the State of California, and maintain zero contacts outside of California, Kamel would still be in violation of the non-competition provision if the Californian company happened to provide revenue enhancement, analytics, technology, or consulting services to any government agency within Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, or Louisiana. Because the provision is overbroad, it is unenforceable under Texas statutory law, and cannot form the basis of a breach of contract claim.[23]

## B. Kamel is Entitled to Summary Judgment on Liability for His Tortious Interference Claim.

To establish a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). Intentional interference does not require intent to injure, only that "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992).

The undisputed evidence shows that Kamel had a valid contract for employment with STA. On May 13, 2018, Kamel received an offer of employment from the company. Kamel accepted

---

[23] "An agreement not to compete which is not appropriately limited may be modified and enforced by a court of equity to the extent necessary to protect the promisee's legitimate interest, but may not be enforced by a court of law." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990). Thus, if the Court decides to reform the scope of the non-competition provision rather than find it invalid, it cannot "award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief." TEX. BUS. & COM. CODE § 15.51(c).

this offer on May 15, 2018, and began working on June 4, 2018. Kamel's employment agreement with STA included a starting salary of $100,000, plus commissions and bonuses, full medical benefits, and stock in the employee-owned company. *See* Ex. A-1.

The undisputed evidence shows that Avenu willfully and intentionally interfered with Kamel's contract with STA. In addition to multiple phone calls with STA, Daryl Savage, counsel for Avenu, threatened STA with "extremely costly and disruptive litigation" if STA did not immediately terminate Kamel's employment:

> Based upon my conversations with you, such a result is decidedly not what you want. If that is in fact the case, then immediate termination of Mr. Kamel's employment appears to be HdL's only reasonable option. Given his theft of Avenu's proprietary information, it is the only option Avenu will accept as a solution that would preclude the need to file a claim alleging among other things breach of the Trade Secrets Act.

Ex. C. According to Avenu, the "immediate termination of Mr. Kamel's employment" was the "only option Avenu [would] accept as a solution." *See id.*

The undisputed evidence shows that but for Avenu's threat of litigation, STA would not have fired Kamel. Richard Fletcher, Vice President of Client Services and Operations for STA, testified:

```
3        Q.  (BY MR. SMITH)  Would STA have fired Ted if
4   Avenu had not contacted STA?
5              MS. KABELE:  Objection; form.
6       A.  No, we would not.  Well, not at the time that
7   it occurred.
```

Fletcher Dep. at 166:3-7.[24]

---

[24] Attached as Exhibit F are excerpts from the deposition of Richard Fletcher with exhibits.

Thus, but for Avenu threating STA with litigation, STA would not have terminated Kamel's employment.[25] Kamel asks the Court find Avenu liable for toritious interference with his employment contract with STA. Kamel reserves the right to prove his damages for trial.

**C.      Avenu Cannot Prevail On Its Breach of Contract Claims.**

**1.      Avenu's Claim for Breach of the 2017 Agreement Fails as a Matter of Law.**

**a.      The 2017 Agreement is Unenforceable.**

As detailed above, Avenu cannot succeed on its breach of contract claim related to the 2017 Agreement because no signed version exists, Kamel received no additional consideration from Avenu for any such noncompetition provision in the 2017 Agreement, and because the restrictive covenants at issue are overbroad, unreasonable, and contrary to public policy. *See supra* Part III.A. Because the 2017 Agreement is unenforceable, Avenu's breach of contact claim fails.

Furthermore, there is evidence that Avenu "knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect [its] goodwill or other business interest," and that Avenue "sought to enforce the covenant to a greater extent than was necessary to protect [its] goodwill or other business interest of the [Avenu]." TEX. BUS. & COM. CODE § 15.51(c); *see* Ex. B and C. Kamel should be awarded his "costs, including reasonable attorney's fees, actually and reasonably incurred by [Kamel] in defending the action to enforce the covenant." TEX. BUS. & COM. CODE § 15.51(c).

---

[25] Kamel asks the Court to find Avenu liable for tortious interference with his contract, and if necessary, proceed to trial on Avenu's affirmative defense of justification.

> **b.      It is Undisputed that Kamel's Alleged Breach of the Non-Compete Provision Did Not Cause Any Damages to Avenu.**

It is also undisputed that Avenu has suffered no damages as a result of Kamel's alleged breach of the noncompetition provision of the 2017 Agreement. Ms. Bullion testified that Avenu is unaware of any actual or nominal damages it suffered as a result of Kamel's employment with STA for less than a month.

```
23        Q.   Breach of contract for the noncompete and
24   breach of fiduciary duty.  Now, the breach of the
25   noncompete alleges that by joining STA, he breached the
```

```
1    contract and y'all were damaged.  I'm asking:  What
2    damages did he inflict on Avenu for joining STA?
3         A.   Okay.  So I -- okay.  So now I get it.  So this
4    is specific to the noncompete component.
5         Q.   Uh-huh.
6         A.   Okay.  So the damages was that STA is a direct
7    competitor of Avenu, and given Ted's history with the
8    company, that the damage was that he has the potential to
9    contact those same clients without giving us the ability
10   to -- one, to backfill the position to get them up to
11   speed and trained, as well as to start building those
12   relationships.
13        Q.   What monetary value do you put on that?
14        A.   I cannot speak to a monetary value.
15        Q.   Do you have any documentation that shows the
16   monetary damage Avenu suffered from him joining STA?
17        A.   I do not have knowledge of it.
18        Q.   Does it exist?
19        A.   I'm uncertain.
```

Bullion Dep. at 137:23-138:19. Kamel's "potential to contact [the] same clients without giving [Avenu] the ability to backfill the position" is certainly not damages on any spectrum and is another

indication of Avenu's pure speculation and fear of Kamel working in the same industry and competing against them. Because Avenu has suffered no damages as a result of Kamel's alleged breach of the noncompetition provision of the 2017 Agreement, the Court should dismiss Avenu's Count II.

### 2. Avenu's Claim for Breach of the Non-Disclosure Provision Fails as a Matter of Law.

"[N]on-disclosure covenants do not restrain trade and competition in the same way that non-solicitation covenants restrain trade and competition. As a result, § 15.50 [of the Texas Business & Commerce Code] does not govern or impair the enforceability of non-disclosure covenants." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003) (citing *CRC–Evans Pipeline Intern., Inc. v. Myers*, 927 S.W.2d 259 (Tex. App.—Houston [1st Dist.] 1996, no writ); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654 (Tex. App.—Dallas 1992, no writ)); *see* TEX. BUS. & COM. CODE § 15.50. "Accordingly, they are not subject to the stringent requirements that Texas law places upon noncompetition agreements." *Oxford Glob. Res., Inc. v. Weekley-Cessnun*, No. CIV.A. 3:04-CV-0330, 2005 WL 350580, at *2 (N.D. Tex. Feb. 8, 2005).

However, "[i]f a nondisclosure covenant[] has the practical effect of 'prohibit[ing] the former employee from using, ***in competition with the former employer, the <u>general knowledge, skill</u>, and <u>experience</u> acquired in former employment***,' then it is more properly characterized as a noncompetition agreement." *Id*. (quoting *ZEP Manufacturing Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.—Houston [1st Dist.] 1988, no writ) (emphasis in original)).

### a. Kamel Did Not Disclose Any Proprietary or Confidential Information.

Avenu's Non-disclosure provision cannot prohibit Kamel from "using or disclosing contact information or other confidential information to the extent it is committed to memory." *Oxford*, 2005 WL 350580.

> In the employment context presently under consideration, the Court considers the network of acquaintances one comes to know through employment to be an aspect of the "general knowledge . . . and experience acquired in former employment" that one could utilize in competition with one's former employer. An agreement prohibiting a former employee in this field from disclosing his acquaintances would therefore be a noncompetition agreement in disguise, and would be unenforceable as such. Some of the other categories of confidential information-for example, financial information-might present different problems, but the present motion does not accuse the Former Employees of disclosing anything other than information related to Clients and Contractors.

*Oxford*, 2005 WL 350580, at *2 (footnotes omitted). Accordingly, Avenu cannot prevail on its claim for breach of the Non-disclosure provision with respect to disclosure of information committed to memory. Accordingly, Kamel is not prohibited from using or disclosing, in competition with Avenu, the general knowledge, skill, and experience acquired in his employment with Avenu, including client contact information, general pricing information, or other confidential information.

```
3        Q.  Okay.  Why did -- why was STA interested in
4   Ted?
5        A.  His experience working in the state
6   legislature, his connections, and his experience working
7   in our industry.
```

Fletcher Dep. at 150:5-11.

The situation may be different with respect to tangible documents or computer files produced by Avenu. Avenu claims that "[Kamel] provided STA with proprietary and confidential information belonging to Avenu related to pricing, information useful to initiating a program related to a H.O.T. sales tax offering, and other Avenu methods, processes, pricing information and other information to the benefit of STA and the detriment of Avenu." (Dkt. # 47 at ¶ 49). However, no such evidence exists.

First, as Mr. Fletcher testified that someone like Kamel who has been in the industry for over 10 years would have the general knowledge of pricing and related sales tax offerings:

```
20        Q.  And how long did you say Kamel had worked in
21   the industry before?
22        A.  12 years, I believe.  Somewhere in that
23   neighborhood.
24        Q.  In your opinion, someone who had worked in the
25   industry for that long would have a general knowledge of
```

```
1   the pricing in that industry?
2        A.  Yes.
```

Fletcher Dep. at 159:20-160:2.

Furthermore, by accepting STA's offer of employment, Kamel was required to confirm that he would not use any documents or property of Avenu at any time while working for STA. Exhibit A-1 at 2. In fact, Richard Fletcher, Vice President of Client Services and Operations for STA, testified that Kamel never provided STA with any property of Avenu.

```
4             Did you have any belief that he had
5   provided STA with Avenu material?
6        A.  No.
7        Q.  Did you have any evidence that he had ever
8   provided Avenu material to STA?
9        A.  No.
```

Fletcher Dep. at 168:4-9.

Furthermore, the pricing information Avenu refers to in its Counterclaim is all public information. Mr. Fletcher further testified:

```
11        Q.  (BY MR. ROYAL)  What about your pricing, is
12    that something you'd want to keep confidential?
13            MS. KABELE:  Objection; form.
14        A.  Sure, I'd like to keep it confidential.  But in
15    this market, that's not really possible.
```

. . . .

```
15        Q.  Do -- do the competitors know what your pricing
16    is with regard to a particular client?
17            MS. KABELE:  Objection; form.
18        A.  I -- I wouldn't know what our competitors know.
19    They can find it out.  They can find that information
20    out.
```

Fletcher Dep. at 50:11-15, 52:15-20. Mr. Fletcher also testified that Kamel never discussed Avenu's pricing models or policies.

```
8         Q.  Prior to receiving this, had you had any
9     discussion with Mr. Kamel regarding what his proposal
10    for per-property rates would be for audits?
11        A.  Again, generally, likely.  But not a specific
12    discussion about pricing.
13        Q.  Did -- had he discussed with you any of the
14    pricing that Avenu had offered to its clients for
15    audits?
16        A.  Not that I recall.
```

. . . .

```
24        Q.  Did Mr. Kamel talk with you at all about --
25    with regard to the contingency fee, what Avenu charged?
```

```
1         A.  I don't recall having a discussion with him
2     regarding that.
```

. . . .

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 22

```
3        Q.  Was there any discussion whatsoever between you
4   and Mr. Kamel regarding the pricing of the STA Texas HOT
5   product above or below the prices established by Avenu?
6        A.  Not that I recall.
```

. . . .

```
5        Q.  Do you recall ever seeing any sort of
6   documentation from Ted regarding pricing that Avenu
7   offered its customers?
8        A.  No.
9        Q.  Do you recall ever receiving any sort of e-mail
10  or text messaging from Mr. Kamel regarding to Avenu's
11  client pricing?
12       A.  Not that I recall.
```

Fletcher Dep. at 77:8-16, 79:24-80:2, 81:3-6, 85:5-12.

Because the undisputed evidence shows that Kamel did not misappropriate any confidential or proprietary information from Avenu, this Court should grant summary judgment for Kamel and dismiss Avenu's claim that Kamel breached the nondisclosure provision of the 2017 Agreement.

b.      **It is Undisputed that Kamel's Alleged Breach of the Nondisclosure Provision Did Not Cause Any Damages to Avenu.**

In addition to failing to provide any evidence that Kamel provided STA with contact information or other confidential information outside Kamel's general knowledge, the undisputed evidence shows Avenu has suffered no damages as a result of Kamel's alleged breach of the nondisclosure provision of the 2017 Agreement (and 2006 Agreement). Even if Kamel did provide STA with "information belonging to Avenu related to pricing, information useful to initiating a program related to a H.O.T. sales tax offering, and other Avenu methods, processes, pricing information and other information," Avenu has suffered no damages. As discussed above, the pricing information Avenu refers to is all public information and is discoverable by competitors.

*See* Part B.2.i. Furthermore, any information belonging to Avenu that is "useful to initiating a program related to a H.O.T. sales tax offering" has had no benefit for STA as STA still does not have a H.O.T. program to this day.[26]

| | |
|---|---|
| 17 | Q.  So describe to me, what is a hotel occupancy |
| 18 | tax audit? |
| 19 | A.  That would be a traditional field audit to |
| 20 | ensure that hotels are remitting tax properly to a local |
| 21 | jurisdiction. |
| 22 | Q.  And -- and so you don't currently offer hotel |
| 23 | occupancy tax audits? |
| 24 | A.  We -- we have the ability to provide that |
| 25 | service in Texas.  We do not currently have any |
| 1 | contracts for that service. |
| 2 | Q.  Have you had any contracts for that service in |
| 3 | the last, say, two years? |
| 4 | A.  No. |

Fletcher Dep. at 12:17-13:4.

Avenu also claims Kamel violated the Non-disclosure provision by "sen[ding] Avenu's proprietary and confidential customer list to his own personal email address for his own purpose and has since refused to surrender the same to Avenu." (Dkt. # 47 at ¶ 48). However, this claim for damages is a future claim of loss, and is based on sheer speculation as to Kamel potential misuse of confidential documents. Because Avenu does not have any evidence to show that Kamel actually misused, divulged, or otherwise misappropriated confidential information covered under the nondisclosure provision, Avenu cannot prove damages. Avenu is merely presuming that it is impossible for Kamel to engage in employment for any other company working in the field of

---

[26] H.O.T. stands for "hotel occupancy tax" audits.

provider of revenue enhancement, analytics, technology and consulting services to government agencies without disclosing Avenu's confidential and proprietary information.

Furthermore, all of the client information is publicly available. Mr. Fletcher testified that STA's portal for storing client information is comprised of "every single taxing entity in the [S]tate of Texas."

```
 2        Q.  Is there any sort of policy or practice that
 3    someone such as Mr. Kamel should enter information into
 4    the portal for clients?
 5        A.  No.
 6        Q.  Or prospective clients?
 7        A.  There's no need to enter that information into
 8    that portal because every single taxing entity in the
 9    state of Texas is already -- exists in that portal.  So
10    it's not really a tracking system.  It's more of a
11    that's my universe.
```

Fletcher Dep. at 102:2-11. He goes on to later state that the client information is all collected from "publicly available data."

```
12            You mentioned STA uses a portal for
13    prospective clients.
14        A.  Yes.
15        Q.  And you said it's my universe.
16            What did you mean by that?
17        A.  Our portal contains every sales taxing entity
18    in the state of Texas.
19        Q.  And what information specifically does that
20    contain?
21        A.  The name of the client, total -- prior years'
22    total sales tax revenues, tax rate, specific codes that
23    are used by the comptroller's office.  There's places to
24    record information about who the contacts might be.  If
25    they've turned in -- if -- if we obtain a contract with
```

```
 1  them, we're able to convert them into a client in our
 2  portal, and that's how they would access their monthly
 3  reporting.
 4      Q.  How is that information collected?
 5      A.  Various sources.  We -- it's a data dump from
 6  the comptroller.  The largest portion of it is a data
 7  dump from the comptroller's office, publicly available
 8  data.
 9      Q.  All public information?
10      A.  Yes.  The data dump portion, yes, all publicly
11  available data.
```

Fletcher Dep. at 161:12-162:11.

It is undisputed that Avenu has suffered no any damages as a result of Kamel's alleged breach of the nondisclosure provision of the 2017 Agreement. Thus, the Court should grant summary judgment for Kamel and dismiss Avenu's claim that Kamel breached the nondisclosure provision.

### 3.  Kamel Did Not Solicit Avenu's Current or Prospective Clients During the Duration of the Non-Solicitation Provision.

Avenu alleges that when Kamel began working with STA he "began providing information necessary to solicit, attempt to solicit or induce current or prospective customers of Avenu to do business with STA by providing contact information, information related to Avenu's pricing methods and other leads to STA via, among other methods, electronic communications exchanged by and between Kamel and Richard Fletcher[.]" (Dkt. #47 at ¶ 70). Avenu further asserts that Kamel continued to solicit current or prospective customers of Avenu following the termination of his employment with STA (Dkt. #47 at ¶ 71). Avenu claims that Kamel's actions violated the nonsolicitation provision of the 2017 Agreement.

As detailed above, Kamel never provided STA with neither Avenu's contact information nor information related to Avenu's pricing methods. Furthermore, STA did not want Kamel

visiting cities and finance directors in Texas during with first year of employment with STA. *See* Ex. A, ¶¶ 6. Following his termination from STA, Kamel did not work for anyone, much less a competitor of Avenu. During the remainder of the noncompete/nonsolicitation period, Kamel never solicited any current or prospective clients of Avenu. Any client communication regarding sales tax services during that time was initiated by the customer. *See* Ex. A, ¶¶ 6, 12.

Because it is undisputed that Kamel did not breach the Non-solicitation provision of the 2017 Agreement, the Court should grant summary judgment for Kamel Avenu's claim should be dismissed.

**D.      Summary Judgement is Proper on Avenu's Claim that Kamel Breached His Fiduciary Duty**

The elements of a breach-of-fiduciary-duty claim are the following: (1) a fiduciary relationship between plaintiff and defendant; (2) a breach of the fiduciary duty owed to the plaintiff by the attorney-defendant; (3) that causes; (4) damages to the plaintiff. *Beck v. Law Offices of Edwin J. Terry, Jr.*, 284 S.W.3d 416, 429 (Tex. App.—Austin 2009, no pet.).

In an employer/employee relationship, both parties have "a duty to deal openly and to make full disclosure to the other members of the [company] about matters affecting the [company's] business." *Bray v. Squires*, 702 S.W.2d 266, 270 (Tex. App.—Houston [1st Dist.] 1985, no writ). But that duty does not preclude an employee from making preparations for a future competing business venture; in fact, at-will employee may take active steps to do so while still employed. *See Bray*, 702 S.W.2d at 270 (explaining why employees were not precluded from making preparation for a future business venture among themselves and the fact that they planned to do so did not constitute a breach of their fiduciary duties to their current employer). Once an employee resigns, in the absence of a non-competition agreement, the employee may actively compete with a former

employer. *Bray*, 702 S.W.2d at 270 ("Absent some special circumstances, once an employee resigns, he may actively compete with his former employer.").

Here, there is no evidence that Kamel did anything that violated any fiduciary duty he might have owed to Avenu. Again, Avenu claims that Kamel breached those fiduciary duties by (1) sending Avenu's proprietary and confidential customer list to his own personal email for his own purpose immediately prior to his resignation, (2) utilizing proprietary and confidential information belonging to Avenu to the benefit of a direct competitor, and (3) soliciting and/or attempting to solicit current and/or prospective customers. (Dkt. #47, ¶¶ 77-80).

As detailed above, however, Kamel never utilized Avenu's confidential or proprietary information after his resignation from Avenu. Furthermore, Kamel never solicited prospective or current customers of Avenu during the 12-month time-restriction. Even if Kamel did solicit customers, he was fully justified because there is no valid non-compete agreement. Avenu has presented no evidence to the contrary. Because Avenu has no evidence that Kamel breached any fiduciary duty he owed Avenu this Court should grant summary judgment for Kamel on that claim.

**E.     Avenu is Not Entitled to An Award of Attorney's Fees or Costs.**

Avenu asks the court to award it attorney's fees and costs under Section 38.001 of the Texas Civil Practice and Remedies Code, which allows recovery of attorney's fees in breach-of-contract suits. TEX. CIV. PRAC. & REM. CODE § 38.001. As explained above, however, Avenu has no valid claim for breach of contract. *See supra*, Part III(B) (advocating summary judgment on Avenu's breach-of-contract claims). With no claim for breach of contract, Avenu has no legal basis to recover attorney's fees.  This Court should therefore deny Avenu request for attorney's fees.

## V.     CONCLUSION

Summary judgment in Kamel's favor on his declaratory judgment claim and Avenu's claims is proper. Kamel thus asks the Court to: (i) grant his motion for summary judgment that

Avenu take nothing on its claims against him for breaches of contract, breach of fiduciary duty, and attorney's fees and costs; (ii) grant his motion for summary judgment declaring that the 2017 Agreement is unenforceable; (iii) grant his motion for summary judgment declaring that the Non-compete provision of the 2017 Agreement is unenforceable (iv) grant his motion for summary judgment finding Avenu liable for tortious interference with a contract; (v) award reasonable and necessary attorneys' fees, expenses, and costs incurred in the prosecution of this lawsuit pursuant to Texas Civil Practice and Remedies Code § 37.009; (vi) award him his reasonable attorney's fees associated with defending Avenue's action to enforce the noncompetition provision of the 2017 Agreement pursuant to Texas Business and Commerce Code § 15.51(c); and (vii) award him his costs and such other relief as he may be entitled.

Dated:  November 22, 2019.

Respectfully submitted,


By: */s/ Austin P. Smith*
Joseph Pevsner
State Bar No. 15874500
Joseph.Pevsner@tklaw.com

Austin Smith
State Bar No. 24102506
Austin.Smith@tklaw.com

THOMPSON & KNIGHT, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel. (214) 969-1700
Fax (214) 969-1751

**ATTORNEYS FOR PLAINTIFF TED KAMEL**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that they caused a true and correct copy of the foregoing to be served on the following counsel of record by the Court's electronic filing system on November 22, 2019:

      Michael P. Royal
      Mark Flores
      Littler Mendelson, P.C.
      2001 Ross Avenue
      Suite 1500, LB 116
      Dallas, Texas 75201-2931

                              */s/ Austin P. Smith*          
                              Austin P. Smith