**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| TED KAMEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 6:18-cv-00422-JDK-KNM |
| | § | |
| AVENU INSIGHTS & ANALYTICS, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF TED KAMEL'S RESPONSE**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Joseph Pevsner
State Bar No. 15874500
Joseph.Pevsner@tklaw.com

Austin Smith
State Bar No. 24102506
Austin.Smith@tklaw.com

THOMPSON & KNIGHT, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel. (214) 969-1700
Fax (214) 969-1751

**ATTORNEYS FOR PLAINTIFF TED KAMEL**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     RESPONSE TO MOVANTS STATEMENT OF ISSUES ................................................1

III.    RESPONSE TO THE STATEMENT OF UNDISPUTED MATERIAL FACTS .............2

IV.     LEGAL STANDARD...................................................................................................6

V.      ARGUMENT AND AUTHORITIES ..............................................................................7

      A.      Avenu's Motion Should be Denied as to Kamel's Count 1 (Declaratory
           Judgment) Because the 2017 Agreement is not Enforceable as a Matter of
           Law. ........................................................................................................ 7

           1.      Avenu has failed to put forth any evidence that the restrictive
                covenants in the 2017 Agreement are reasonable, and therefore,
                enforceable. .................................................................................. 7

           2.      A Fact Issue Exists as to Whether the 2017 Agreement is a Valid
                Contract Under Texas Law. ........................................................... 9

                a.      Avenu cannot show there was a valid offer. ...................................10

                b.      Avenu cannot show a meeting of the minds and acceptance of
                    the 2017 Agreement by Kamel as a matter of law........................10

                c.      The 2017 Agreement is Unenforceable Because it is Not
                    Supported by Valid Consideration.................................................14

      B.      Avenu's Motion Should be Denied as to Kamel's Count 2 (Tortious
            Interference with Contract) and Count 3 (Tortious Interference with
            Prospective Contract)............................................................................. 16

      C.      Avenu's Motion Should be Denied as to its Count II (Breach of Contract,
            Non-Competition) and Count III (Breach of Contract, Non-Solicitation)............ 18

      D.      Avenu's Motion Should be Denied as to its Count I (Breach of Contract,
            Confidentiality). ................................................................................... 21

      E.      Avenu's Motion for Judgment on its Count IV (Breach of Fiduciary Duty)
            Should be Denied.................................................................................. 24

VI.     CONCLUSION..........................................................................................................25

1

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*,
   209 S.W.3d 644 (Tex. 2006)................................................................................................ 15

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................... 6, 7

*Angelou v. African Overseas Union*,
   33 S.W.3d 269 (Tex. App.—Houston [14th Dist.] 2000, no pet. ............................................. 10

*Beck v. Law Offices of Edwin J. Terry, Jr.*,
   284 S.W.3d 416 (Tex. App.—Austin 2009, no pet.) .............................................................. 24

*Calvillo v. Gonzalez*,
   922 S.W.2d 928 (Tex. 1996)................................................................................................ 17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................................... 6, 7

*DeSantis v. Wackenhut Corp.*,
   793 S.W.2d 670 (Tex. 1990)................................................................................................ 15

*Eurecat, US, Inc. v. Marklun*d,
   527 S.W.3d 367 (Tex. App.—Houston [14th Dist.] 2017)...................................................... 15

*Huckaba v. Ref-Chem, L.P.*,
   892 F.3d 686 (5th Cir. 2018) .............................................................................................. 11

*In re Bunzl USA, Inc.*,
   155 S.W.3d 202 (Tex. App.—El Paso 2004, no pet.)...................................................... 10, 11

*Kmart Stores of Texas, L.L.C. v. Ramirez*,
   510 S.W.3d 559 (Tex. App.—El Paso 2016, no pet.)............................................................. 13

*Marsh USA Inc. v. Cook*,
   354 S.W.3d 764 (Tex. 2011)...................................................................................... 7, 8, 12

*McCoy v. Alden Indus., Inc.*,
   469 S.W.3d 716 (Tex. App.—Fort Worth 2015, no pet.)..................................................... 9, 10

*Merritt Hawkins & Assocs., LLC v. Gresham*,
   79 F. Supp. 3d 625 (N.D. Tex. 2015) ................................................................................. 24

*New York Party Shuttle, LLC v. Bile,*
    *Ilo,* 414 S.W.3d 206 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ..................................... 10

*Oxford Glob. Res., Inc. v. Weekley-Cessnun,*
    No. CIV.A. 3:04-CV-0330, 2005 WL 350580 (N.D. Tex. Feb. 8, 2005) .................................. 8

*Powerhouse Prods., Inc. v. Scott,*
    260 S.W.3d 693 (Tex. App.—Dallas 2008, no pet.) ............................................................. 15

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,*
    29 S.W.3d 74 (Tex. 2000) .................................................................................................... 16

*Scaife v. Associated Air Ctr., Inc.,*
    100 F.3d 406 (5th Cir. 1996) ............................................................................................... 11

*Smith v. Nerium Int'l, LLC,*
    No. 05-18-00617-CV, 2019 WL 3543583 (Tex. App.—Dallas, Aug. 5, 2019, no pet.) ........... 7

*Tricon Energy Ltd. v. Vinmar Int'l, Ltd.,*
    718 F.3d 448 (5th Cir. 2013) ............................................................................................... 11

*Wal-Mart Stores, Inc. v. Constantine,*
    2018 WL 2001959 (Tex. App.–Dallas, Apr. 30, 2018) .................................................. 12, 13

Zep Mfg. Co. v. Harthcock, 824 S.W.,
    2d 654 (Tex. App.—Dallas 1992, no writ) ............................................................................ 8

**Statutes**

Tex. Bus. & Com. Code § 15.05(a) ......................................................................................... 7, 12

Tex. Bus. & Com. Code § 15.50 ................................................................................................... 1

Tex. Bus. & Com. Code § 15.50(a) ............................................................................................... 7

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................................... 6

Plaintiff Ted Kamel ("Kamel") files this Response to Defendant Avenu Insights & Analytics, LLC's ("Defendant" or "Avenu") Motion for Summary Judgment (the "Motion") as follows:

## I.       INTRODUCTION

To be enforceable, a non-competition agreement must, among other things, (1) contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable" and  (2) "not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise." Tex. Bus. & Com. Code § 15.50. A threshold issue on virtually all of the issues before the Court therefore is whether or not the agreement in question meets these requirements. But Avenu's motion does not even <u>mention</u> these requirements, much less present any compelling argument as to how they are met. And it is clear they are not. Accordingly, and for the additional reasons set out below, Avenu's motion should be denied.

## II.       RESPONSE TO MOVANTS STATEMENT OF ISSUES

1.       Kamel disputes the proposed issues because the record reflects multiple genuine issues of material fact including: (1) whether the 2017 Agreement contains reasonable limitations; (2) whether there was a valid offer of the 2017 Agreement; (3) whether Kamel executed or acknowledged the 2017 Agreement; and (4) whether the 2017 Agreement is supported by consideration.

2.       Kamel disputes the proposed issues because the record reflects multiple genuine issues of material fact including: (1) whether the 2017 Agreement contains reasonable limitations, and (2) whether the 2017 Agreement is unenforceable as a matter of law.

3.       Kamel disputes the proposed issues because the record reflects multiple genuine issues of material fact including: (1) whether the 2017 Agreement contains reasonable limitations; (2) whether the 2017 Agreement is unenforceable as a matter of law; (3) whether Kamel's conduct

falls outside the language of the non-compete and non-solicitation provisions of the 2017 Agreement;

4.      Kamel disputes the proposed issues because the record reflects multiple genuine issues of material fact including: (1) whether Kamel owed any duties following the termination of his employment; (2) whether he transferred a list prior to or after Avenu terminated his employment; and (3) whether Kamel breached any fiduciary duties to Avenu.

5.      Kamel disputes the proposed issues because the record reflects multiple genuine issues of material fact including: (1) whether Avenu had a legal right to threaten STA with litigation, and (2) whether Avenu provided STA with false information.

6.      Kamel disputes the proposed issues because the record reflects multiple genuine issues of material fact including whether Avenu's conduct with independently unlawful.

### III.      RESPONSE TO THE STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1.      Kamel admits he entered into a Confidentiality Agreement in 2006 with Avenu's predecessor-in-interest. [AVENU (KAMEL) 0000108].[2] Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

2.      Kamel disputes the proposed fact insofar as it claims the email was sent to Kamel. [Kamel Dep. at 192:17-193:7].[3] Kamel also disputes the proposed fact insofar as it claims that Kamel acknowledge the 2017 Agreement.[4]

---

[1] Kamel incorporates by reference its Statement of Facts contained in its Motion for Partial Summary Judgment [Dkt. #49]
[2] The documents identified as [AVENU (KAMEL) _____] have been attached as Exhibit 1 to the unsworn declaration of Austin Smith attached to this Response as Exhibit.
[3] The deposition excerpts of Ted Kamel have been attached as Exhibit 2 to the unsworn declaration of Austin Smith attached to this Response as <u>Exhibit A</u>.
[4] Attached as <u>Exhibit B</u> is the sworn affidavit of Ted Kamel.

3.      Kamel disputes the proposed fact insofar as it claims Kamel signed any 2017 Agreement with Avenu or its predecessor-in-interest. [Ex. B, ¶ 8].

4.      Kamel disputes the proposed fact insofar as it claims Kamel signed any 2017 Agreement with Avenu or its predecessor-in-interest. [Ex. B, ¶ 8]. Kamel further disputes the proposed fact insofar as it claims Avenu provided Kamel with confidential information after he allegedly singed the 2017 Agreement. [Bullion Dep. at 83:5-14].[5] Kamel also disputes the proposed fact as it implies Avenu's customer information and pricing information is not publicly accessible. [Fletcher Dep. at 161:12-162:11].[6]

5.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes the proposed fact insofar as it implies Kamel knew of the existence and location of the 2017 Agreement prior to December 2017. Kamel disputes the proposed fact that the HR portal contains documents solely relevant to Kamel.

6.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel also disputes the proposed fact insofar as it claims that Kamel acknowledge the 2017 Agreement [Ex. B, ¶ 8].

7.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes the proposed fact insofar as it implies Kamel had any intention of leaving his employment with Avenu [STA 00640].[7]

---

[5] The deposition excerpts of April Bullion, Avenu Insights & Analytics LLC's Corporate Representative, have been attached as Exhibit 3 to the unsworn declaration of Austin Smith attached to this Response as Exhibit A. Ms. Bullion was designated to testify as to matters listed on Plaintiff's deposition notice attached as Exhibit 4 to the unsworn declaration of Austin Smith attached to this Response as Exhibit A.

[6] The deposition excerpts of Richard Fletcher have been attached as Exhibit 5 to the unsworn declaration of Austin Smith attached to this Response as Exhibit A.

[7] The documents identified as [STA _____] have been attached as Exhibit 6 to the unsworn declaration of Austin Smith attached to this Response as Exhibit.

8.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes the proposed fact insofar as it implies Kamel had any intention of leaving his employment with Avenu [STA 00640].

9.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes the proposed fact insofar as it implies Kamel had any plans of leaving his employment with Avenu [STA 00640].

10.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel further disputes the proposed fact that "Kamel informed colleagues at Avenu that his departure from Avenu was imminent." [*See* AVENU (KAMEL) 0001048-50].

11.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel agrees that Avenu terminated Kamel's employment on March 29, 2018. [Kamel Dep. at 153:11-154:17]. Kamel also disputes that he sent himself the list after he was terminated. [Kamel Dep. at 191:8-15].

12.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

13.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes the proposed facts insofar as they imply Kamel's duties and responsibilities at STA were the "same or similar in nature" to those her performed at Avenu.

14.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel further disputes that Kamel texted Fletcher "Wednesday I am doing Gun Barrell City and then meeting you in Duncanville." Richard Fletcher drafted that text message.

15.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel also disputes the proposed fact insofar as it claims that Kamel

4

acknowledge the 2017 Agreement [Ex. B, ¶ 8]. Kamel also disputes the proposed fact that Kamel returned the laptop and other equipment damaged [Bullion Dep. at 112:14-113:9].

16.     Kamel disputes the entirety of the proposed facts in paragraph 16. [KAMEL000912];[8] [Fletcher Dep. at 168:4-9]. Kamel further disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

17.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

18.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

      a.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. [*See* KAMEL000204-05].

      b.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. [*See* KAMEL000204-05].

      c.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes that he provided any confidential information of Avenu. [*See* KAMEL000195].

      d.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes that he provided any confidential information of Avenu. [*See* KAMEL000195].

      e.     Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

---

[8] The documents identified as [AVENU (KAMEL) _____] have been attached as Exhibit 1 to the unsworn declaration of Jared Parks attached as Exhibit C to this Response.

    f.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

    g.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

    h.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

    i.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

    j.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct. Kamel disputes the fact that he represented he worked for STA.

    k.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

    l.      Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

19.    Kamel disputes the proposed fact insofar as it implies Kamel engaged in any unlawful conduct.

## IV.    LEGAL STANDARD

Summary judgment is appropriate only when it appears from the record "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The movant must identify those portions of the evidence that demonstrate that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Once the movant has done so, the nonmoving party may show that summary judgment is improper by presenting

affirmative evidence, setting forth specific facts to show the existence of a genuine issue for trial.

*See Celotex Corp.*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 247-48.

## V.     ARGUMENT AND AUTHORITIES

**A.     Avenu's Motion Should be Denied as to Kamel's Count 1 (Declaratory Judgment) Because the 2017 Agreement is not Enforceable as a Matter of Law.**

**1.     Avenu has failed to put forth any evidence that the restrictive covenants in the 2017 Agreement are reasonable, and therefore, enforceable.**

Kamel addresses below why the 2017 Agreement is unenforceable due to the lack of a valid offer, acceptance, and consideration. But before discussing those issues, Kamel notes that even if the 2017 Agreement <u>did</u> meet the requirements of a contract under Texas law, the restrictive covenants in that agreement would nevertheless be unenforceable because they are unreasonable as a matter of law. In Texas, the general rule is that every contract "in restraint of trade or commerce" is unlawful. *Smith v. Nerium Int'l, LLC*, No. 05-18-00617-CV, 2019 WL 3543583, at *4 (Tex. App.—Dallas, Aug. 5, 2019, no pet.) (citing TEX. BUS. & COM. CODE § 15.05(a)). A narrow exception exists if certain requirements are met. One such requirement is that the covenant be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." *Id*. § 15.50(a); *see also Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 773 (Tex. 2011). Second, an "otherwise enforceable agreement" must be one that gives rise to "an interest worthy of protection" or that reasonably relate to the promisee's "legitimate interest being protected." *Marsh USA* Inc, *354* S.W.3d at 775, 778. In addition, a covenant not to compete is enforceable only "to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that [i] are reasonable and [ii] do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE § 15.50(a).

These requirements apply not only to traditional covenants not to compete, but also to agreements that "restrict [former employees'] solicitation of the former employers' customers and

employees." *Marsh USA Inc.*, 354 S.W.3d at 768. In addition, "[i]f a nondisclosure covenant[] has the practical effect of 'prohibit[ing] the former employee from using, *in competition with the former employer*, the *general* knowledge, skill, and experience acquired in former employment,' then it is more properly characterized as a noncompetition agreement." *Oxford Glob. Res., Inc. v. Weekley-Cessnun*, No. CIV.A. 3:04-CV-0330, 2005 WL 350580, at *2 (N.D. Tex. Feb. 8, 2005) (quoting *ZEP Manufacturing Co. v. Harthcock,* 824 S.W.2d 654, 663 (Tex. App.—Houston [1st Dist.] 1988, no writ) (emphasis in original)).

Because the 2017 Agreement's primary purpose was to obligate Kamel to provide personal services, it is Avenu's burden to prove that the restrictive covenants in the 2017 Agreement meet the above-discussed statutory requirements. But Avenu has made no attempt whatsoever to prove that the restrictive covenants in the 2017 Agreement satisfy these requirements.

And they clearly do not. For example, the 2017 Agreement's noncompetition provision restricted Kamel's ability to compete more broadly than just Texas.As  Mr.  Savage's  "Notice  of Breach" letter to Kamel stated:

> As HdL (including STA) is a direct competitor of Avenu . . . your acceptance of employment with STA *within the Central Region* is in direct violation of the terms of the [2017] Agreement.

[AVENU (KAMEL) 000001]. As defined in the 2017 Agreement, the Central Region includes: Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, and Louisiana." It is undisputed that Kamel only worked within the State of Texas. [Bullion Dep. at 31:9-15]. Thus, the restriction in this case is unreasonably overbroad on its face because it covers areas where Kamel did not actually work.

Furthermore, restrictive covenants at issue here purport to preclude Kamel from "owning or controlling any interest in, or working" either "directly or indirectly, for, any person, firm,

partnership, corporation, or other entity" that is in competition with Avenu. This is defined as a "person or entity engaged in business as a provider of revenue enhancement, analytics, technology and consulting services to government agencies, within the Central Region to include; Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, and Louisiana." In other words, the 2017 Agreement purports to prevent Kamel from working for any company anywhere in the world if that company also happens to engage in revenue enhancement, analytics, technology, or consulting services for government agencies within any of the thirteen states listed. For example, even if Kamel were to move to California, work for a company based in California, work solely within in the State of California, and maintain zero contacts outside of California, Kamel would still be in violation of the non-competition provision if the Californian company happened to provide revenue enhancement, analytics, technology, or consulting services to any government agency within Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, or Louisiana. Because the provision is overbroad, it is unenforceable under Texas law.

Because Avenu failed to establish that the restrictive covenants in the 2017 Agreement are reasonable, their motion to dismiss Count 1 of Kamel's petition must be denied.

## 2.   A Fact Issue Exists as to Whether the 2017 Agreement is a Valid Contract Under Texas Law.

To form a valid contract in Texas, there must be "(1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *McCoy v. Alden Indus., Inc.*, 469 S.W.3d 716, 728 (Tex. App.—Fort Worth 2015, no pet.). Avenu's

motion with respect to Kamel's Count 1 should be denied for the additional reason that there is a fact issue as to whether the 2017 Agreement is valid contract under Texas law.

### a.   *Avenu cannot show there was a valid offer.*

Avenu claims that, on August 28, 2017, April Buillion sent an email to Kamel stating that the 2017 Agreement had been uploaded to Kamel's ADP account. [*See* AVENU (KAMEL) 0000934].[9] The email in question was sent to the following email addresses: AllMMC@muniservices.com,            All-BirminghamOffice@muniservices.com,            and AllEgov@muniservices.com. *Id.* Avenu has presented no evidence that emails sent to these addresses were routed to Kamel's email address. And, for his part, Kamel testified that he does not recall ever receiving this email. [Kamel Dep. at 192:17-193:7]. Accordingly, genuine fact issues exist as to whether Avenu ever sent the offer to Kamel and whether Kamel ever received Avenu's offer to enter into the 2017 Agreement.

### b.   *Avenu cannot show a meeting of the minds and acceptance of the 2017 Agreement by Kamel as a matter of law.*

A fact issue also exists as to whether Kamel accepted the offer, to the extent it was made. The 2017 Agreement required Kamel's signature in order to be bound: it was not signed. Evidence of mutual assent in written contracts generally requires the signatures of the parties and delivery with the intent to bind. *See Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.— Houston [14th Dist.] 2000, no pet.). Whether a written contract is signed is relevant in determining of whether the contract is binding on the parties. *N.Y. Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 214 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, no pet.)). Parties may provide that the signature of each party

---

[9] When discussing the evidence submitted by Avenu with its motion, Kamel uses the same citation format.

is a prerequisite to a binding written contract. *Id*. "[W]hether a signature is required to bind the parties is a question of the parties' intent." *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018) (citing *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 454 (5th Cir. 2013)).

The 2017 Agreement contains the following signature block:

EMPLOYEE

Print Name:      _____

Signature:        _____

Date:               _____

[AVENU (KAMEL) 0000008]. Paragraph 7 of the 2017 Agreement also contains the following statement: "This Agreement sets forth the entire understanding of the parties regarding the subject matter contained herein … and shall not be modified except by a written document signed by all parties." [AVENU (KAMEL) 0000008, ¶ 7]. This signature block, along with the clause in the 2017 Agreement barring amendments without a writing signed by both parties, shows that the parties intended that signatures were required in order to be bound by the 2017 Agreement. *See Scaife v. Associated Air Ctr., Inc.,* 100 F.3d 406, 410–11 (5th Cir. 1996) (affirming summary judgment where the presence of a signature block and a signed-modification requirement clause clearly evidenced the parties' intent that the agreement be signed before it could be enforced); *In re Bunzl USA, Inc.*, 155 S.W.3d 202 (Tex. App.—El Paso 2004, orig. proceeding [mand. denied]) (holding trial court did not abuse its discretion in denying an employer's motion to compel arbitration where the employer failed to (1) sign the arbitration agreement and (2) show that the parties intended to be bound without the employer's signature).

Avenu cannot provide any evidence of a signed agreement between the parties, and Avenu's claim that Kamel "electronically acknowledged, executed and agreed to" the 2017 Agreement is wholly inconsistent including the signature block, which requires a written signature.

11

Indeed, Avenu's Corporate Representative, testified that the purpose of the signature line was for a wet (*i.e.* physical) signature:

> Q. Okay. So an electronic signature would not be on the signature line?
> A. Correct, that it would not be on the physical document, itself.
> Q. So the only signature on the signature line would be wet?
> A. That's correct.

[Bullion Dep. at 66:2-8]. Because the parties intended that Kamel physically sign the 2017 Agreement to be bound by it, his failure to do so means no contract was formed.

Avenu cites to *Wal-Mart Stores, Inc. v. Constantine*, a case involving a motion to compel arbitration,[10] for the proposition that the recorded acknowledgement in the ADP system proves as a matter of law that Kamel personally acknowledged the 2017 Agreement. But *Constantine* is distinguishable. First, in the context of enforcing an *arbitration agreement*, in order for an employer to prove an employee accepted the terms of an arbitration agreement as a matter of law, the employer need only prove that the employee had *notice* of the arbitration policy and *continued working* with knowledge of the policy. *Id*. at *5. Avenu has a different burden to show that the signature of each party was not a prerequisite for the 2017 Agreement, a *noncompetition agreement*, to be binding. *See Marsh*, 354 S.W.3d at 770 ("In section 15.05(a) of the Business and Commerce Code, the Legislature included a policy limitation on the freedom between employers and employees to contract: 'Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful.'").

Second, *Constantine* involved a process where the employee had to agree to the arbitration agreement before the employee would have the ability to "continue with the application process nor submit the application." *Id*. But that was not the case with the 2017 Agreement. According to

---

[10] 2018 WL 2001959, at *5 (Tex. App.–Dallas, Apr. 30, 2018). Kamel notes that, although Avenu claims that this case is from the Northern District of Texas, it is actually a state court appellate decision.

Ms. Bullion, an Avenu employee could "review" or "view," but not "acknowledge," the 2017 Agreement and continue to access documents on the ADP system. [Bullion Depo at 69:23-70:4]. According to Avenu, a similar report would show the employee only viewed the document. [*See* AVENU (KAMEL) 0001060]. Thus, there is evidence that Kamel could continue to access and "review" documents on ADP even if he did not acknowledge the 2017 Agreement.

Third, unlike the 2017 Agreement, there is no indication that the arbitration agreement in *Constantine* contained a signature block for the employee physically sign. *Id*. at *2-3. This is an important distinction given the above-discussed caselaw.

Finally, the employee in *Constantine* was deceased and, thus, could not attest that he in fact did not acknowledge the arbitration agreement. *Id*. at *6-7. Here, by comparison, Kamel testified he does not recall ever seeing a copy of the 2017 Agreement prior to December 2017 and does not recall ever logging into ADP to acknowledge the 2017 Agreement. [Kamel Dep. at 197:2-14]. *See Kmart Stores of Texas, L.L.C. v. Ramirez*, 510 S.W.3d 559, 569-70 (Tex. App.—El Paso 2016, no pet.) (holding employee's affidavit denying that she ever electronically acknowledged or agreed to any arbitration agreement was sufficient to create a fact issue). The evidence also shows that Kamel failed to acknowledge other Avenu employee agreements through the ADP system. For, example, Kamel never acknowledged Avenu's Employee Handbook, which required the same electronic acknowledgement process on ADP. [Bullion Dep. at 39:2-13]. Even after multiple reminders from Ms. Bullion, Kamel never electronically acknowledged the Employee Handbook. [AVENU (KAMEL 000070); AVENU (KAMEL) 0000091].

There are also material fact issues as to whether Kamel admitted to Mr. Fletcher that he acknowledged the 2017 Agreement online. On December 12, 2017, at 9:30 A.M., in response to

an inquiry by Mr. Fletcher, Kamel texted Mr. Fletcher, "[I] found nothing in my HR files relating to non compete." [STA 00638]; [Kamel Dep. at 124:3-7].

Furthermore, Kamel testified he rarely visited his HR portal [Kamel Dep. at 126:5-12], and that when he eventually searched through his HR files he found the unsigned 2017 Agreement and forwarded it to Mr. Fletcher. Mr. Fletcher testified that after Kamel forwarded the 2017 Agreement to him, Kamel told him that he never executed the 2017 Agreement. [Fletcher Dep. at 57:2-9]. Kamel likewise testified that when he found the 2017 Agreement, he did not believe it was effective because he "didn't see a signature anywhere and [he] had signed everything else that [Avenu] had asked [him] to sign, physically signed it." [Kamel Dep. at 128:4-7].

On December 20, 2017, Mr. Fletcher asked Kamel if he ever signed the 2017 Agreement. [STA 00639]. Kamel responded "I acknowledged online." Although Avenu claims that this ambiguous text means that Kamel conclusively "admitted . . . that he acknowledged the 2017 Agreement online," it could just as well have meant that Kamel understood that Avenu's systems reflected that he had acknowledged it." Kamel does not remember acknowledging the 2017 Agreement online and to this day does not believe he did so. Ex. B, ¶ 8. At the very minimum, the text message is ambiguous and there is a genuine issue of material fact as to whether Kamel ever acknowledged the 2017 Agreement online.

Avenu cannot conclusively provide that the parties did not intend to be bound by the 2017 Agreement without the Kamel's signature, or that Kamel electronically acknowledged the 2017. Accordingly, there is a fact issue as to whether the Kamel ever agreed to the 2017 Agreement.

       **c.**    **The 2017 Agreement is Unenforceable Because it is Not Supported by Valid Consideration.**

"[T]he Legislature and the courts [do] not allow an employer to spring a non-compete covenant on an existing employee and enforce such a covenant absent new consideration from the

employer." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). "[A]n agreement not to compete, like any other contract, must be supported by consideration." *Id*. (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 n.6 (Tex. 1990)). "[A] covenant not to compete could be signed after the employment relationship began so long as the covenant is supported by new consideration in an enforceable contract." *Alex Sheshunoff Mgmt. Servs.,* 209 S.W.3d at 654. The consideration from the employer "must give rise to the employer's interest in restraining the employee from competing." *Id.* at 648–49. Such consideration can include new confidential or proprietary information.

But, although Avenu claims in its motion that it gave Kamel such information as consideration for the 2017 Agreement, it has wholly failed to cite to actual evidence that it did so <u>after</u> the date he allegedly agreed to the 2017 Agreement.  Avenu also cannot point to any evidence that its claims for breach of the 2017 Agreement *are based* on the disclosure of confidential information it provided to Kamel after August 29, 2017, that differed from information he previously possessed. *Eurecat*, 527 S.W.3d at 390 ("Eurecat does not point to any evidence that its claims for breach of the 2011 agreements were based on disclosure of confidential information it provided to Marklund and Wene after January 31, 2011 that differed from information they previously possessed."); *see Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 697–98 (Tex. App.—Dallas 2008, no pet.) (holding confidential information employer provided ongoing employee prior to agreement could not supply consideration for agreement). Moreover, Avenu's Corporate Representative testified that Kamel received confidential information before he allegedly signed the Agreement and that she was unaware of any additional confidential or proprietary information he received after he allegedly signed the Agreement:

> Q:    So just to -- to reiterate, Ted received confidential information before he signed the agreement?

15

A:      I can't confirm specifically, but yes.

Q:      And you cannot identify any additional confidential information he received
        after he signed the noncompete agreement?

A:      I'm not saying that there wasn't any. I'm saying I cannot confirm today.

Q:      You can't identify it?

A:      Correct.

. . .

Q.      Can you point to any additional confidential information right now?

A:      I pointed to potential examples. I do not have any specifics in front of me
        that I could provide.

Q:      Do you know of any specifics?

A:      Specific examples, no.

Q:      Not examples. Actual confidential information.

A:      Oh, gotcha. Hold on. Let me think about that just to be certain I answer -- I
        cannot point to a specific document.

Q:      Any information, specific information, a name?

A:      I cannot.

. . .

Q:      Ultimately you can't point to any information, documents that Ted received
        for signing his noncompete agreement -- nonsolicit --

A:      I specifically cannot point to one today, correct.

[Bullion Dep. at 83:5-14, 84:5-16, 86:11-15]. Avenu is bound by its inability to identify any such

information at the deposition.

**B.      Avenu's Motion Should be Denied as to Kamel's Count 2 (Tortious Interference
        with Contract) and Count 3 (Tortious Interference with Prospective Contract)**

Avenu's motion should be denied with respect to both of Kame's tortious interference

claims. The elements of tortious interference with a contract are (1) an existing contract subject to

interference, (2) a willful and intentional act of interference with the contract, (3) that proximately

caused the plaintiff's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v.*

*Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Avenu does not dispute the existence of

these elements, and instead contends as an affirmative defense that its actions were justified. That

defense is without merit.

16

For example, Avenu argues it "simply provided truthful information and honest advice to STA regarding the existence of the non-competition agreement" and "sought to enforce its contractual rights to protect is confidential information . . . pursuant to the 2017 Agreement." [Dkt. 51 at 20-21]. But, as discussed above, there is at least a fact issue as to whether the contractual rights under the 2017 Agreement that Avenu claims to have sought to enforce were in fact valid.

Moreover, Avenu did far more than "provide truthful information" and "seek to enforce its contractual rights"; instead it unambiguously threatened STA with "extremely costly and disruptive litigation" if STA did not immediately terminate Kamel's employment

> Based upon my conversations with you, such a result is decidedly not what you want. If that is in fact the case, then immediate termination of Mr. Kamel's employment appears to be HdL's only reasonable option. Given his theft of Avenu's proprietary information, it is the only option Avenu will accept as a solution that would preclude the need to file a claim alleging among other things breach of the Trade Secrets Act.

[AVENU (KAMEL) 0000023]. And it did so despite being fully aware that it did not have any legal basis to assert a cause of action against STA/HdL at that time [Savage Dep. at 111:20-113:5].[11]

More troublingly, Avenu made these improper threats even after STA offered to move Kamel to a geographic region (Washington) that was not covered by the 2017 Agreement. [Savage Dep. at 95:17-96:9]. There was no justifiable basis for continuing to threaten litigation under these circumstances, especially in light of the fact that the only confidential information that Kamel allegedly took from Avenu was contact information for clients in Texas.

Avenu cites *Calvillo v. Gonzalez* for the proposition that Avenu was justified in contacting STA to enforce its contractual rights under the 2017 Agreement. 922 S.W.2d 928 (Tex. 1996).

---

[11] The deposition excerpts of Daryl Savage have been attached as <u>Exhibit 7</u> to the unsworn declaration of Austin Smith attached to this Response as Exhibit A.

However, the Texas Supreme Court's focus in *Calvillo* was whether a "defendant's motivation behind the assertion of a legal right," which it ultimately found irrelevant to the analysis of the justification defense. The Court found Calvillo's exclusive contract with the hospital allowing Calvillo to furnish anesthesiologists "in [Calvillo's] sole discretion" justified his refusal to schedule Gonzalez to work at the hospital. In contrast, Avneu has no contractual right to threaten STA with litigation when it knows it did not have any legal basis to assert a cause of action against STA.[12]

Lastly, regarding Kamel's claim for tortious interference with a prospective contract, Avenu committed an independently wrongful act when it attempt to enforce the 2017 Agreement in an illegal manner. Enforcing the 2017 Agreement to prevent Kamel from working the State of Washington was an illegal act in itself. Accordingly, there is a fact issue as to whether Avenu tortiously interfered with current and prospective contracts.

## C. Avenu's Motion Should be Denied as to its Count II (Breach of Contract, Non-Competition) and Count III (Breach of Contract, Non-Solicitation).

Avenu's motion for judgment on its claim that Kamel breached the 2017 Agreement's non-competition and non-solicitation provisions must be denied because, as noted above, there is a fact issue as to whether the 2017 Agreement is valid as a matter of law, and for the additional reason that Kamel has not even attempted to demonstrate that these restrictive covenants are reasonable and otherwise comply with Texas law. Moreover, even if the 2017 Agreement's noncompetition

---

[12] In addition to Avenu's unreasonable conclusion(s) that serve the basis for contacting STA, the email contains several false allegations. The email states that Kamel "returned the laptop and other equipment severely damaged" implying that Kamel conduct resulted in the equipment being damaged. However, the evidence shows that Kamel returned the equipment in accordance with Ms. Bullion's instructions. [AVENU (KAMEL) 0000078-79]; Bullion Dep. 112:7-10]. Ms. Bullion never recommended certain packaging materials to Kamel [Bullion Dep. at 111:1-14]. Ms. Bullion also testified that Avenu also never inquired with UPS on how they shipped the equipment and it's very possible Kamel returned the equipment in perfect condition and it actually was destroyed by UPS. [Bullion Dep. at 112:14-113:9]. Thus, there is no truth behind the statement that Kamel returned the laptop and other equipment severely damaged.

and nonsolicitation provisions were enforceable, summary judgment should still be denied on these claims because there is a fact issue as to whether Kamel violated them.

Nowhere in 2017 Agreement does it state the enforcement of the Noncompete provision is limited to Texas, or limited the geographic area where an employee actually worked. [Savage Dep. at 80:16-81:1]. During the drafting the 2017 Agreement and after its completion, there were no discussions on how the 2017 Agreement would enforced upon an Avnue employee. [Savage Dep. at 82:4-11, 82:20-83:1]. There is no written policy of other document stating how Avenu enforces the Noncompete provision. [Savage Dep. at 85:13-15, 86:1-5]. Mr. Savage testified he did not know who decides how Avenu is going to enforce the Noncompete provision. [Savage Dep. at 85:19-22]. He further testified that the determination that Avenu was only going to enforce the Noncompete provision against Kamel in Texas had in fact not been made. [Savage Dep. at 86:6-10]. Avenu has never attempted to enforce the 2017 Agreement against any Avenu employ besides Kamel [Savage at Dep. 83:2-6] and its claim that Avenu would only enforce the Noncompete provision against Kamel in Texas lacks any merit.

There is also a fact issue as to whether Kamel's conduct after his termination from Avenu falls outside the scope of the language of the Noncompete provision. The 2017 Agreement's noncompetition provision prohibited Kamel from "working (defined as performing duties and having responsibilities that are the same or similar in nature to those that Employee performed while employed by GRS) . . . for a GRS Competitor." [AVENU (KAMEL) 0000007, ¶ 2.1]. Avenu has not presented any evidence that Kamel's took any action during the two months he was employed by STA that fall within the scope of this provision. And there is at least a fact issue whether Kamel was hired to perform the same or similar duties and responsibilities at STA that he performed while employed with Avenu as evidenced by the relevant job descriptions:

19

| Avenu Insights & Analytics LLP | Sales Tax Assurance an HdL Company |
|---|---|
| <ul><li>Identify, develop, and maintain relations with potential clients</li><li>Consistently maintains a strong pipeline of clients and strives to close potential sales</li><li>Makes regular sales calls to develop relationship and proactively follow-up on leads</li><li>Schedules sales visits regularly in their territory to meet with potential clients</li><li>Builds and maintains a network of colleagues and customers to obtain prospects</li><li>Negotiates with clients for efficient services delivery at profitable fees</li><li>Draft client service agreement providing details on scope of service and compensation</li><li>Negotiates with client to execute contract</li><li>Provides feedback to management on market trends as represented by clients</li><li>Prepares for, and participates in new business site visits.</li></ul> | <ul><li>Analyze, prepare and present sales and use tax reports to clients including revenue projections: respond to client inquiries and requests for special reports and information; market to prospective clients and represent the company at various professional associations.</li><li>Coordinate client issues and contribute to improvements in existing core services.</li><li>Contribute to and manage the development and implementation of additional services and/or programs with your primary focus on Hotel Tax audit, reporting and tax administration services.</li><li>Coordinate and communicate with the client services team to ensure quality and responsive services are provided to client agencies.</li></ul> |

[AVENU (KAMEL) 0000013]; [KAMEL 000911-13]

Avenu claims that Kamel's communications with Fletcher _after_ STA fired Kamel constitute a breach of his noncompetition obligations. But they do not, because the 2017 Agreement's noncompetition provision only applies to actions taken while Kamel "own[ed] or control[ed] any interst in, or work[ed] . . . for a GRS Competitor." The complained-of communications therefore fall outside the language of the noncompetition provision.

Avenu likewise has not proved that Kamel violated the nonsolicitation provision of the 2017 Agreement. The only alleged solicitations it identifies are Kamel's post-STA communications with Fletcher. But there is no evidence that Kamel himself solicited any of the entities discussed in these communications.  [KAMEL000204-05 ("Scotty Jones in Victoria _reached out to me_ this morning.")]; [KAMEL000195 ("I just got a _communication from_ Lauren

Justice with Tyler . . . She said they are 'not happy' with Muni. They want to change.")];
[KAMEL000189 ("CM of Whitehouse [ ] *asked me* to engage you.")]; KAMEL000182-83
(Brownsville *finance director reached out to him* with an inquiry about sales tax reporting)]. Black
Law's Dictionary defines solicitation, as "[t]he act or an instance of requesting or seeking to obtain
something; a request or petition." *Soliciation*, Black's Law Dictionary (11th ed. 2019). There is no
evidence that Kamel took any actions that meet that definition. Accordingly, there is a material
fact issue whether Kamel ever solicited Avenu's clients.

Indeed, when asked what actions would violate the 2017 Agreement's nonsolicitation
provision, the lawyer who drafted it gave the following example:

> A:    A customer calls the former employee up and asks if they know someone
> or they are working with someone that can provide services in competition
> with Avenu, and -- and the employee is, in fact, engaged in employment
> with a competitor.

[Savage Dep. at 46:2-7]. And, when asked whether the provision would apply if the former
employee was unemployed at the time of the customer contact, he admitted:

> Q.    The employee is unemployed and a customer reaches out to him to inquire
> about Revenue Services, he's not employed with any – any Revenue Service
> provider, is that in violation of this nonsolicitation agreement?
>
> . . .
>
> A.    Well, it doesn't – the nonsolicitation provision does not apply to the
> scenario you described.

[Savage Dep. at 47:10-19]. Avenu's motion therefore should be denied as to these two counts.

**D.    Avenu's Motion Should be Denied as to its Count I (Breach of Contract, Confidentiality).**

Avenu's motion for judgment on its claim that Kamel breached the 2017 Agreement's
nondisclosure provision should be denied because, as noted above, there is a fact issue as to
whether the 2017 Agreement is valid as a matter of law.

In addition, a fact issue exists as to whether Kamel ever disclosed any confidential information to STA or any other third party in violation of any contractual obligations he had to Avenu. Indeed, Avenu itself admits that it only "presumes" that Kamel's work for STA involved the disclosure of knowledge he obtained from Avenu. *See* [Dkt. #51 at 23] ("Kamel advised STA on the implementation of a HOT program using information related to Avenu's pricing of plans and other knowledge *presumably obtained* while Kamel worked at Avenu.") (emphasis added).

As an initial matter, Richard Fletcher, Vice President of Client Services and Operations for STA, testified that Kamel never provided STA with any property of Avenu.

> Q:   Did you have any belief that he had provided STA with Avenu material?
> A:   No.
> Q:   Did you have any evidence that he had ever provided Avenu material to STA?
> A:   No.

[Fletcher Dep. at 168:4-9]; *see also* Exhibit A-1 at 2 (confirming that he would not use any documents or property of Avenu at any time while working for STA). Fletcher also testified that Kamel never discussed Avenu's pricing models or policies.

> Q:   Prior to receiving this, had you had any discussion with Mr. Kamel regarding what his proposal for per-property rates would be for audits?
> A:   Again, generally, likely. But not a specific discussion about pricing.
> Q:   Did -- had he discussed with you any of the pricing that Avenu had offered to its clients for audits?
> A:   Not that I recall.
> . . . .
> Q:   Did Mr. Kamel talk with you at all about -- with regard to the contingency fee, what Avenu charged?
> A:   I don't recall having a discussion with him regarding that
> . . . .
> Q:   Was there any discussion whatsoever between you and Mr. Kamel regarding the pricing of the STA Texas HOT product above or below the prices established by Avenu?
> A:   Not that I recall.
> . . . .
> Q:   Do you recall ever seeing any sort of documentation from Ted regarding pricing that Avenu offered its customers?

A:     No.
Q:     Do you recall ever receiving any sort of e-mail or text messaging from Mr.
       Kamel regarding to Avenu's client pricing?
A:     Not that I recall.

[Fletcher Dep. at 77:8-16, 79:24-80:2, 81:3-6, 85:5-12]; *see also* [Fletcher Dep. at 50:11-

15, 52:15-20] (testifying that it is not possible to keep pricing information from a competitor in

this market).

Similarly, there is no evidence that Kamel ever disclosed any confidential client

information to STA, which is not surprising given that such information is publically available:

Q:     Is there any sort of policy or practice that someone such as Mr. Kamel
       should enter information into the portal for clients?
A:     No.
Q:     Or prospective clients?
A:     There's no need to enter that information into that portal because every
       single taxing entity in the state of Texas is already -- exists in that portal. So
       it's not really a tracking system. It's more of a that's my universe.
. . .
Q:     You mentioned STA uses a portal for prospective clients.
A:     Yes.
Q:     And you said it's my universe. What did you mean by that?
A:     Our portal contains every sales taxing entity in the state of Texas.
Q:     And what information specifically does that contain?
A:     The name of the client, total -- prior years' total sales tax revenues, tax rate,
       specific codes that are used by the comptroller's office. There's places to
       record information about who the contacts might be. If they've turned in --
       if -- if we obtain a contract with them, we're able to convert them into a
       client in our portal, and that's how they would access their monthly
       reporting.
Q:     How is that information collected?
A:     Various sources. We -- it's a data dump from the comptroller. The largest
       portion of it is a data dump from the comptroller's office, publicly available
       data.
Q:     All public information?
A:     Yes. The data dump portion, yes, all publicly available data.

[Fletcher Dep. at 102:2-11, 161:12-162:11].

Avenu also contends that Kamel emailed a list containing confidential information to himself.[13] But even if that document—which is comprised of publically available information—were covered by the nondisclosure provisions in the 2006 or 2017 agreements, there is no evidence that Kamel ever transferred or disclosed the list to any third-party.

In short, because there is at least a fact issue as to whether Kamel disclosed any of Avenu's confidential or proprietary, as opposed to his own general knowledge of the industry, its motion for judgment on its Count I should be denied.

### E.    Avenu's Motion for Judgment on its Count IV (Breach of Fiduciary Duty) Should be Denied.

The elements of a breach-of-fiduciary-duty claim are the following: (1) a fiduciary relationship between plaintiff and defendant; (2) a breach of the fiduciary duty owed to the plaintiff by the defendant; (3) that causes; (4) damages to the plaintiff. *Beck v. Law Offices of Edwin J. Terry, Jr.*, 284 S.W.3d 416, 429 (Tex. App.—Austin 2009, no pet.). Avenu has made no attempt to establish the first element of this claim. That is perhaps not surprising, because "Texas law does not generally recognize a fiduciary duty between employers and employees." *Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 637 (N.D. Tex. 2015), *aff'd sub nom. Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143 (5th Cir. 2017) (internal quote omitted). That is especially true when the alleged breach occurs after the employee's employment ends.[14] *See generally id.* Avenu's motion for judgment on this claim can and should be denied on this ground alone.

---

[13] The fact that Kamel may maintain access to that client list is merely the result of the forensic search Kamel previously conducted on his personal msn.com email account pursuant to his discovery obligations. [Ex. B, ¶ 4].

[14] Avenu has inconsistently pled whether Kamel was still employed when he emailed himself the client list. Avenu claims Kamel breached his fiduciary duties owed to Avenu by taking the contact list *while still employed* with Avenu. [ Dkt. #51 at 27]; [*See* Dkt. 51, Statement of Undisputed Facts ¶ 10 – "Avenu *terminated* Kamel's employment ton March 29, 2018 during a teleconference that was scheduled for 1:30 PM. *Fifteen minutes later, Kamel sent a list* containing governmental entity names and their contact information to his personal email."]. This inconsistency alone creates a material fact issue for Avenu's breach of fiduciary duty claim.

The motion should be denied for the additional reason that Avenu has not proved a breach of any fiduciary duty owed by Kamel, or any damage caused by such a breach. The <u>only</u> action that Avenu identifies as the breach is his alleged emailing of a customer list <u>to himself</u>. Avenu makes no effort to explain why that alleged action constitutes a breach under applicable law, nor does it present any evidence that it was harmed in any way by this alleged action. These are additional reasons to deny the motion with respect to this claim.

## VI.     CONCLUSION

Numerous fact issues preclude summary judgment in Kamel's favor.  Kamel therefore respectfully requests that the Court deny Avenu's Motion for Summary Judgment in its entirety. Kamel requests all other relief to which it has shown himself justly entitled.

Dated:  December 13, 2019.

Respectfully submitted,

By: <u>*/s/ Austin P. Smith*</u>
Joseph Pevsner
State Bar No. 15874500
Joseph.Pevsner@tklaw.com

Austin Smith
State Bar No. 24102506
Austin.Smith@tklaw.com

THOMPSON & KNIGHT, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel. (214) 969-1700
Fax (214) 969-1751

**ATTORNEYS FOR PLAINTIFF TED KAMEL**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that they caused a true and correct copy of the foregoing to be served on the following counsel of record by the Court's electronic filing system on December 13, 2019:

Michael P. Royal
Mark Flores
Littler Mendelson, P.C.
2001 Ross Avenue
Suite 1500, LB 116
Dallas, Texas 75201-2931


*/s/ Austin P. Smith*
Austin P. Smith

26