IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TED KAMEL, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Case No. 6:18-cv-422-JDK-KNM |
| § | |
| AVENU INSIGHTS & ANALYTICS § | |
| LLC, § | |
| § | |
| Defendant. § | |

**ORDER ADOPTING REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Ted Kamel sued Defendant Avenu Insights & Analytics LLC for tortious interference with a contract and prospective business relations and seeks a declaratory judgment that a non-compete, non-solicitation, and non-disclosure agreement was unenforceable as a matter of law. The case was referred to United States Magistrate Judge K. Nicole Mitchell pursuant to 28 U.S.C. § 636. Both parties have moved for summary judgment.

On May 5, 2020, the Magistrate Judge issued a Report and Recommendation ("the Report") recommending that the Court deny Kamel's summary judgment motion and grant in part and deny in part Avenu's summary judgment motion. Docket No. 79 at 31. Specifically, the Report recommended granting Avenu's motion in part as to the validity of the 2017 Agreement as reformed by the Court, granting Avenu's motion as to Kamel's claims for tortious interference with contract and tortious interference with prospective business relations, and granting Avenu's

1

claims for breach of contract as to the non-solicitation and non-competition provisions of the 2017 Agreement. *Id.* The Report recommended denying Avenu's motion as to its claims for breach of fiduciary duty and breach of contract as to the non-disclosure provision of the 2017 Agreement. *Id.*

Kamel timely objected (Docket No. 80), and Avenu responded (Docket No. 81). Avenu did not file objections. As explained below, the Court **OVERRULES** Kamel's objections and **ADOPTS** the Magistrate Judge's Report and Recommendation.

## I.

This Court reviews objected-to portions of the Magistrate Judge's Report and Recommendation de novo. Fed. R. Civ. P. 72; 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). In conducting a de novo review, the Court examines the entire record and makes an independent assessment under the law. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), *superseded on other grounds by statute*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

## II.

Here, Kamel objects to six of the Magistrate Judge's findings. Specifically, that: (1) "Avenu conclusively proved that Avenu offered the 2017 Agreement to Kamel and Kamel accepted the 2017 Agreement"; (2) "Avenu provided evidence to support the conclusion that Avenu provided Kamel with new consideration for entering into the 2017 Agreement"; (3) "the geographical limitation of the non-compete provision of the 2017 Agreement should be reformed to the entire State of

Texas"; (4) "Avenu conclusively proved that it was acting within its own legal rights when it demanded Kamel's termination with STA [Sales Tax Assurance, an HdL Company]"; (5) "Avenu conclusively proved that Kamel breached the non-compete provision of the 2017 Agreement as reformed by joining STA"; and (6) "Avenu conclusively proved that Kamel breached the non-solicitation provision of the 2017 Agreement by referring contacts and leads to Richard Fletcher while employed with STA." Docket No. 80 at 5.  The Court analyzes each objection in turn.

### A.

Kamel first argues that the Magistrate Judge "improperly concluded that Avenu conclusively proved that Avenu offered the 2017 Agreement to Kamel and Kamel accepted the 2017 Agreement." Docket No. 80 at 6. Kamel contends that there is a genuine issue of material fact as to whether he received the 2017 Agreement. *Id.* Specifically, Kamel argues that Avenu has not shown that Kamel received an email notifying employees about the 2017 Agreement and re-asserts that he "does not recall receiving the email." *Id.* Kamel also argues that there is a fact question as to whether he acknowledged the 2017 Agreement. *Id.* at 6–7.  The Court disagrees.

*First*, Avenu established that Kamel received the 2017 Agreement. April Bullion, Avenu's Vice President of Human Resources, testified: "[T]he email was sent out from an HR email address, from myself, *to the employees of Avenu* making them aware that the agreement had been uploaded within an ADP account . . . ." Docket No. 68, Ex. E-5 at 62:20–24 (emphasis added). Kamel argues that this statement does not mean that the email was addressed to *all* employees of Avenu—only that it was addressed to "the employees of Avenu." Docket No. 80 at 6. This is a strained

reading of Bullion's clear testimony. In any event, Avenu provided evidence that its electronic document management system recorded Kamel viewing and acknowledging the 2017 Agreement on August 29, 2019, at 9:38 p.m. Docket No. 50, Ex. A-1 at 8. And Kamel's argument that he does not "recall receiving the email" is unavailing. *See Keurig Dr. Pepper Inc. v. Chenier*, 2019 WL 3958154, at *9 (E.D. Tex. Aug. 22, 2019) (finding that a failed memory of a contract "is not compelling under Texas—or a general understanding of—contract law").

*Second*, the evidence establishes that Kamel executed the 2017 Agreement online. As mentioned, Avenu presented evidence that Kamel viewed and acknowledged the 2017 Agreement through the ADP system. Docket No. 50, Ex. A-1 at 8. If Kamel had merely viewed the agreement without acknowledging it, the status of the agreement would only show as "viewed." Docket No. 59, Ex. A-1 at 36. Kamel also testified that he had a personal ADP log-in and personal password and had no "reason to believe that someone improperly stole [his] ADP log-in . . . [and] password." Docket No. 50, Ex. B-1 at 195:3–18. He further testified that he had no knowledge of anyone else "getting into [his] account." *Id.* at 196:2–5. Additionally, in a text message with Richard Fletcher, Fletcher asked: "Did you sign a copy of the document that you sent to me, or is that the new version that you never signed?" Docket No. 59, Ex. A-6 at 3. Kamel responded: "i [sic] acknowledged online." *Id.* Kamel's objections are therefore overruled.

## B.

Kamel next objects to the Magistrate Judge's conclusion that Avenu provided Kamel with new consideration to enter the 2017 Agreement. Docket No. 80 at 7. In

particular, Kamel contends that there is no evidence that Avenu sent new confidential information to Kamel and, in any event, the information is not confidential because it is publicly available. *Id.* at 8.

"To be valid and enforceable, a contract must include consideration, that is, a mutuality of obligation." *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 696 (W.D. Tex. 2019). "A covenant not to compete must be supported by valuable consideration." *Martin v. Credit Protection Ass'n, Inc.*, 793 S.W.2d 667, 669 (Tex. 1990). "Texas courts have regularly found there is an enforceable agreement supporting a non-compete covenant where an employer promises to provide an employee with confidential information and the employee promises not to disclose such confidential information." *Miner*, 383 F. Supp. 3d at 696.

Here, the Magistrate Judge properly concluded that Avenu provided Kamel with new confidential information after he signed the 2017 Agreement, which is sufficient consideration under Texas law. The 2017 Agreement states: "WHEREAS, in the course of Employee's employment with GRS, Employee will have access to certain confidential information, including trade secrets of GRS that are proprietary to GRS and must be kept confidential in order to protect GRS's business interests . . . ." Docket No. 50, Ex. A-1 at 2. Avenu presented evidence that Kamel sent "a compilation of multiple points of contacts for accounts belonging to multiple sales executives" in an email to Brennan Middleton and Stephen Morrison on January 9, 2018. Docket No. 57, Ex. B-1 at 381; Ex. C ¶ 21. Kamel argues that this evidence "shows that Kamel provided the list to Avenu, not the other way around."

5

Docket No. 80 at 8. But Avenu presented a sworn declaration from Brennan Middleton, who attested that this "confidential compilation of information" would not "have been provided to Kamel on January 6, 2018 absent his execution of the 2017 Agreement." Docket No. 57, Ex. C ¶ 21. Middleton also testified that this information "is located on the password protected servers of Avenu and is not publicly available as the confidential compilation provides a competitive advantage to Avenu." *Id.*

Avenu also presented evidence that it provided other confidential information to Kamel, such as a "confidential compilation of contact information for current Avenu clients contained in the password protected SalesForce system," "leads that were produced from attendance at [a] conference," "a spreadsheet with confidential information related to standard pricing models, business opportunities and other related marketing materials and information," "documents containing confidential information related to business opportunities," and "a spreadsheet that has a confidential compilation of the end dates of contracts executed by and between Avenu and municipalities and districts across . . . Texas as well as the fees generated and communications previously exchanged." *Id.* at ¶¶ 16–20. Middleton attested that Avenu would not have provided Kamel with any of this information if he had not signed the 2017 Agreement and that this confidential information provides a "competitive advantage" to Avenu. *Id.*

Kamel also argues that the confidential information was publicly available and therefore did not justify the restrictions of the 2017 Agreement. However, as

described above, Avenu provided a great deal of confidential information to Kamel, including contact information for clients, points of contact, sales leads, pricing information, contract information for clients, and SalesForce database information. *Id.* ¶¶ 16–24. Avenu provided evidence that this information is "password-protected, and access is restricted to current employees on a need to know basis." *Id.* ¶ 9. Brennan Middleton attested that Avenu "does not release its pricing information and/or pricing strategies to the general public and considers this information to be confidential" because it is "essential to providing competitive bids and responses to requests for proposals issued by the governmental entities with which it does business." *Id.* ¶ 11. He also testified that the confidential information provided to Kamel consisted of "trade secrets" that "derive independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." *Id.* ¶ 15.

Kamel's only evidence to the contrary is testimony from Richard Fletcher, an employee of STA. Fletcher testified that client information is publicly available and that it is "not really possible" to keep pricing information confidential "in this market." Docket No. 65, Ex. A-5 at 50:11–15; 52:15–20; 161:12–162:11. But even if Fletcher's testimony shows that pricing and client information is not confidential, Avenu provided several other types of confidential information to Kamel, including pricing strategies and leads produced from attendance at a conference. This confidential information represents new consideration for the 2017 Agreement. Accordingly, Kamel's objections on this point are overruled.

## C.

Kamel next objects to the Magistrate Judge's reformation of the geographical limits of the 2017 Agreement's non-compete provision. Docket No. 80 at 9. The Magistrate Judge found that the 2017 Agreement's geographic limitations were unreasonable because the 2017 Agreement restricted Kamel's ability to work in the Central Region of the United States (Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, and Louisiana) and both parties agreed that Kamel worked only in Texas and served only Texas clients. Docket No. 79 at 17–19. Thus, the Magistrate Judge recommended restricting the geographic restriction in the 2017 Agreement to the state of Texas. *Id.* at 19.

"Texas courts generally enforce covenants that are restricted to the geographic territory within which the bound employee worked during his employment." *Keurig Dr. Pepper Inc.*, 2019 WL 3958154, at *10 (quoting *Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 634 (N.D. Tex. 2015)). Whether a territorial restraint is reasonable also "depends upon the nature and extent of the employer's business and the degree of the employee's involvement." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

Kamel argues that the reformed restriction to Texas is still unreasonable because his "sales territory was limited to certain *regions* of the State of Texas." Docket No. 80 at 9. Kamel's own testimony, however, provides evidence that he worked throughout Texas. Kamel testified that he and another client services manager at Avenu split the state of Texas into two separate regions, but that "[w]e

8

worked together on several client service issues to clients. We actually got them together. So we shared them." Docket No. 66, Ex. A-2 at 133:2–134:14. He then confirmed that he worked on some clients that were outside his region: "[J]ust by the fact that I was the HOT guy in Texas, I had to help most of her clients that had hotel audits. So I actually had to provide services to her clients most of the time." *Id.* at 134:15–23. He also gave a specific example of a client in a city outside his region, where he "physically went and did the audits with the audit team . . . . [The other client services manager] relied heavily on Ted to help her make sure that everything went great." *Id.* at 135:4–19. Thus, Kamel, by his own admission, worked throughout Texas and outside of his assigned region. The Magistrate Judge's reformation of the non-compete clause to cover the entire state of Texas is therefore reasonable.

Kamel also argues that the confidential information provided by Avenu did not justify the non-compete provision of the 2017 Agreement. But as discussed above, Avenu has shown that it produced a wide array of proprietary and confidential information to Kamel that was critical to Avenu's competitiveness in the market. *See supra* Part II.B. Thus, Avenu has shown that the restrictions of the 2017 Agreement were justified. *See, e.g., Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 651–53 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("[A] covenant not to compete is enforceable not only to protect trade secrets but also to protect proprietary and confidential information. Customer information is a legitimate interest which may be protected in an otherwise enforceable covenant not to compete.").[1]

---

[1] Kamel also argues that "Avenu failed to put forth evidence or argument that the restrictive covenants in the 2017 Agreement are reasonable" and therefore that he is entitled to summary

9

### D.

Kamel's next objection is that "the Magistrate Judge incorrectly found that Avenu conclusively proved its justification defense to Kamel's tortious interference claim." Docket No. 80 at 10. Kamel argues that Avenu threatened litigation against his subsequent employer, STA, if they did not terminate Kamel and was "fully aware that it did not have any legal basis to assert a cause of action against STA at that time." *Id.*

The elements for a tortious interference claim are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). "[A]s an affirmative defense, a defendant may negate liability on the ground that its conduct was privileged or justified." *Id.* at 77–78. "[T]he justification defense is based on either the exercise of (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996). If

---

judgment on this claim. *Id.* Kamel's objection on this point is non-specific and unclear. *See Janvey v. Venger*, No. 3:10-CV-0366-N-BG, 2014 WL 12823381, at *1 (N.D. Tex. Apr. 8, 2014) ("To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found."). In any event, the Magistrate Judge properly concluded that the 2017 Agreement was unreasonable because the geographic restrictions were too broad. As mentioned, however, the new reformed restriction to the state of Texas is reasonable. And Kamel has never argued that the temporal or scope of activity restrictions in the 2017 Agreement are unreasonable. Thus, the Court overrules Kamel's vague objection that the 2017 Agreement was unreasonable.

the Court "finds as a matter of law that the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense and the motivation behind assertion of that right is irrelevant." *Id.*

Kamel argues that an email from Daryl Savage, counsel for Avenu, to Adam Weg, counsel for STA, shows that Avenu tortiously interfered with his contract at STA. In that email, Savage wrote that Kamel "knowingly transferred proprietary Avenu customer contact information to his personal account. The only reason to transfer such Avenu customer contact information to his own email account would be because he intended to contact Avenu customers after leaving the company." Docket No. 63, Ex. A-1 at 6. Savage also stated that he and Weg "discussed the possibility that HdL could limit Mr. Kamel's activities to opportunities in Washington State during the pendency of the non-compete," but that Avenu "opposed that option because there was really no way to trust that Mr. Kamel would adhere to the letter and spirit of the non-compete." *Id.* Savage also wrote: "Based upon our discovery of Mr. Kamel's theft of Avenu's proprietary customer list, we now have more than a reasonable belief that Mr. Kamel intends to use that information in his future endeavors with HdL. Such unauthorized use, of course, will lead, inevitably, to extremely costly and disruptive litigation." *Id.* Savage stated that if Kamel were to remain employed at HdL, "the only reasonable conclusion we can reasonably draw is that HdL intends . . . to use such Avenu proprietary information to infringe our IP and gain an illegal competitive advantage." *Id.* Thus, Savage suggested that

11

"immediate termination of Mr. Kamel's employment appears to be HdL's only reasonable option." *Id.*

Here, the Magistrate Judge properly concluded that Avenu was justified in exercising its legal rights under the 2017 Agreement. The 2017 Agreement was valid. After Kamel resigned from Avenu, Avenu discovered that Kamel had emailed a confidential list of Avenu's clients to himself on March 29, 2018. Docket No. 50, Ex. B-3 at 28–37. Brennan Middleton attested that he compared the confidential customer list that Kamel emailed himself to the customer list in Avenu's SalesForce database and found that "99% of the records were a direct match." Docket No. 50, Ex. C ¶ 6. The evidence therefore shows that Avenu was enforcing its rights under the 2017 Agreement when it contacted STA.

Kamel argues that Avenu "made . . . improper threats and . . . attempt[ed] to enforce rights under the 2017 Agreement that it did not possess" because STA "offered to move Kamel to a geographic region (Washington) that was not covered by the 2017 Agreement." Docket No. 80 at 11. This argument fails for the reasons stated above. Based on Kamel's conduct upon his resignation with Avenu, Avenu understandably had concerns that Kamel would use the confidential information he obtained from Avenu during his employment at STA, even if his employment were limited to Washington. Kamel's objection therefore fails.

### E.

Kamel's fifth objection is that "the Magistrate Judge improperly found that Avenu conclusively proved its breach of the non-compete claim." Docket No. 80 at 12. Kamel argues that he has "presented sufficient evidence of the differences in duties

and responsibilities to create a fact issue whether Kamel was hired to perform the same or similar duties and responsibilities at STA that he performed while employed with Avenu as evidenced by the relevant job descriptions." *Id.*[2]

The 2017 Agreement's non-compete provision states: "Employee agrees to refrain from owning or controlling any interest in, or working (defined as performing duties and having responsibilities that are the same or similar in nature to those that Employee performed while employed by GRS)" for a GRS competitor. Docket No. 50, Ex. A-1 at 3. STA's offer letter to Kamel described his job duties as: (1) "Analyze, prepare and present sales and use tax reports to clients including revenue projections; respond to client inquiries and requests for special reports and information; market to prospective clients and represent the company at various professional associations"; (2) "Coordinate client issues and contribute to improvements in existing core services"; (3) "Contribute to and manage the development and implementation of additional services and/or programs with your primary focus on Hotel Tax audit, reporting and tax administration services"; and (4) "Coordinate and communicate with the client services team to ensure quality and responsive services are provided to client agencies." Docket No. 50, Ex. B-3 at 25.

Kamel's deposition testimony provides sufficient evidence that his job responsibilities at STA were the same or similar in nature to his job responsibilities at Avenu. After reading the job duties from his STA offer letter, Kamel testified

---

[2] Kamel also rehashes his argument that the non-compete provision of the 2017 Agreement is unenforceable because the Magistrate Judge's reformed restriction to the entire state of Texas is not a reasonable geographic limitation. Docket No. 80 at 11. For the reasons stated in Part III.C, the Court overrules this objection.

concerning the STA job: "It looks like client services, prepare sales, prepare reports, a lot of what I did when I was with [Avenu]." Docket No. 63, Ex. B-1 at 210:13–211:3. And Kamel confirmed that he performed the same or similar functions at STA and Avenu. For example, he "respond[ed] to client inquiries and requests for special reports and information while [he] was at Avenu," "market[ed] to prospective clients and represent[ed] the company at various professional associations while at Avenu," performed hotel tax audit functions at Avenu, and "coordinate[d] and communicate[d] with the client services team to ensure quality and responsive services are provided to client agencies" at Avenu. *Id.* at 211:1–216:2. The Court therefore agrees with the Magistrate Judge that Kamel performed similar job functions at STA and Avenu and that Kamel breached the non-compete provision of the 2017 Agreement.

## F.

Kamel's final objection is that the "Magistrate Judge incorrectly found that Avenu conclusively proved its breach of the non-solicitation claim." Docket No. 80 at 13. Kamel argues that "the summary judgment evidence does not show that there was indirect solicitation while Kamel was employed with STA" because the only solicitation Avenu identified are Kamel's communications with Richard Fletcher after he was fired from STA. *Id.* Kamel also argues that he did not violate the non-solicitation provision in the 2017 Agreement because he did not solicit any other person in his communications—instead, they reached out to him. *Id.* Finally, Kamel argues that the evidence shows that "Avenu did not intend for the non-solicitation provision to apply to a former Avenu employee who was unemployed at the time of the communications." *Id.* at 13–14.

14

>The 2017 Agreement's non-solicitation provision reads:
>
>During Employee's employment with GRS and for a period of twelve (12) months following the termination of Employee's employment with GRS, for any reason whatsoever, Employee shall not directly or indirectly: (i) solicit any current or prospective customers of GRS with whom Employee had contact or learned confidential information about as a result of his/her employment with GRS in competition with GRS; (ii) solicit, induce, or attempt to induce any current customer of GRS (or any prospective customers that either GRS or Employee had contact with while Employee was employed by GRS) to cease doing business in whole or in part with or through GRS or to do business with any other person, firm, partnership, corporation, or other entity which performs services that are the same or similar to or competitive with those provided by GRS . . . .

Docket No. 50, Ex. A-1 at 3.

Here, the summary judgment evidence establishes that Kamel violated the non-solicitation provision. As the Magistrate Judge properly concluded, Kamel, at the very least, forwarded information to Richard Fletcher at STA about Kamel's former and current clients. For example, on July 9, 2018, Kamel emailed Fletcher that one of Avenu's former clients reached out to Kamel, but Kamel did not respond. Docket No. 50, Ex. B-3 at 9. Kamel did tell Fletcher, however, that it would be an "easy win for you." *Id.* On October 17, 2018, Kamel emailed Fletcher that one Avenu client wanted Fletcher to contact her, that the client was not happy with Avenu, and that the client wanted a change. *Id.* at 8. And on January 9, 2019, Kamel emailed Fletcher that a contact at one of Avenu's clients asked Kamel to "engage [Fletcher]" to contact the client and that the client "made it clear he was ready to do something." *Id.* at 7.

These communications provided contact information and leads for Avenu's former and current clients that Kamel thought would be good targets for STA. Kamel

therefore breached the non-solicitation provision of the 2017 Agreement because Kamel indirectly attempted to induce Avenu clients to "cease doing business" with Avenu and "to do business with" a competitor.  Docket No. 50, Ex. A-1 at 3.

Kamel argues that any alleged misconduct occurred one week after his termination from STA and thus did not violate the 2017 Agreement.  But the non-solicitation provision clearly states that it governs Kamel's conduct "for a period of twelve (12) months following the termination of [Kamel's] employment with [Avenu]." *Id.*  Kamel also argues that the non-solicitation provision does not apply to a former Avenu employee who was unemployed at the time of the communication.  But the plain text of the non-solicitation provision does not support that view.  The Court therefore overrules Kamel's objections on this issue.

### III.

This Court has conducted a careful de novo review of the record and the Magistrate Judge's proposed findings and recommendations and is of the opinion that the findings and conclusions of the Magistrate Judge are correct and that the objections are without merit.

Accordingly, the Court hereby **ADOPTS** the Report and Recommendation (Docket No. 79) as the opinion of the Court.  It is therefore **ORDERED** that Kamel's Motion for Partial Summary Judgment (Docket No. 49) is **DENIED**.  It is further **ORDERED** that Avenu's Motion for Summary Judgment (Docket No. 50) is **GRANTED IN PART** and **DENIED IN PART**.  The Court **GRANTS** Avenu's motion as to Kamel's claims for tortious interference with contract and tortious interference with prospective business relations and Avenu's claims for breach of

16

contract as to the non-solicitation and non-competition provisions of the 2017 Agreement.  The Court **GRANTS IN PART** Avenu's summary judgment motion as to the validity of the 2017 Agreement as reformed by the Court.  The Court **DENIES** Avenu's summary judgment motion as to: (1) breach of fiduciary duty; and (2) breach of contract related to the non-disclosure provision of the 2017 Agreement.

So **ORDERED** and **SIGNED** this **7th**   day of  **October, 2020.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE